STATE ex rel. MARCO SALES, INC., and Dierberg Service Company, Inc., both Missouri corporations, Relators-Respondents,

and

Union Electric Company, the Trane Company, and the Office of the Public Counsel of the State of Missouri, Intervenors-Relators-Respondents,

v.

PUBLIC SERVICE COMMISSION of the State of Missouri, Appellant,

and

Laclede Gas Company, Intervenor-Appellant.

No. WD 34,997.

Missouri Court of Appeals, Western District.

Dec. 4, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Jan. 29, 1985.

Eric Kendall Banks, Missouri Public Serv. Comm'n, Jefferson City, for appellant Public Service Commission.

Robert M. Lee and Donald L. Godiner, St. Louis, for intervenor-appellant Laclede Gas Co.

Leland B. Curtis, Clayton, for relators-respondents Marco Sales, Inc. and Dierberg Service Co., Inc.

E. Ronald Hill, Union Electric Company, St. Louis, for intervenor-relator-respondent Union Electric Co.

Thomas J. Downey, Jefferson City, for intervenor-relator-respondent The Trane Co.

Richard W. French, Asst. Public Counsel, Jefferson City, for Office of the Public Counsel of the State of Missouri.

Before PRITCHARD, P.J., and SOMERVILLE and KENNEDY, JJ.

SOMERVILLE, Judge.

This appeal arises from a utility rate order entered by the Public Service Commission of Missouri (hereinafter Commission). The controversial order authorized Laclede Gas Company (hereinafter Laclede) to impose, on an interim basis, a surcharge tariff on gas service customers who supplement their space heating needs with electric add-on heat pumps.

Heat pumps, devices of recent origin, are a technological adaptation of a scientific fact discovered by an English scientist, Lord Kelvin, in 1852—there is heat in cold air down to absolute zero (minus 459.69 degrees Fahrenheit). Their versatility is exemplified by their ability to both heat and cool. Simplistically stated, they can serve as central air conditioners during warm seasons and then, during cold seasons, reverse their operation and extract heat from outside air for internal heating purposes. Their use in conjunction with commercial heating systems as supplemental sources of heat accelerated with the advent of the recent energy crisis.

A potential aura of confusion arising from alignment of the parties calls for an explanation. Marco Sales, Inc., a distributor of electric add-on heat pumps in the St. Louis area, and Dierberg Service Company, Inc., one of its dealers (hereinafter collectively referred to as Marco), filed a formal complaint with the Commission charging that Laclede was in violation of § 393.130, RSMo 1978, by its unilateral promulgation of a surcharge on gas customers utilizing electric add-on heat pumps without obtaining tariff approval from the Commission. Laclede answered the complaint lodged by Marco and, in addition, filed a proposed surcharge tariff whose approval by order of the Commission is the genesis of the present appeal. Marco, The Trane Company (hereinafter Trane), and Union Electric Company (hereinafter Union Electric) were permitted to intervene in the tariff case at the Commission level. The complaint and proposed surcharge tariff were consolidated for hearing before the Commission.

The tariff order in question, paraphrased in general terms, authorized Laclede to impose a uniform monthly surcharge (approximately $15.00 per month) on each gas customer with an electric add-on heat pump during the months of November, December, January, February, March and April. After the order was handed down by the

Commission, Marco filed an application for rehearing pursuant to § 386.500, RSMo 1978, which was denied by the Commission. Thereupon, Marco filed an application for review in the Circuit Court of Cole County as provided in § 386.510, RSMo 1978. The Circuit Court of Cole County granted Marco's application for review and also permitted Laclede to intervene as a respondent therein, and the Office of the Public Counsel, Trane and Union Electric to intervene as relators therein.

The Circuit Court of Cole County reversed the order of the Commission approving the surcharge tariff on Laclede's gas customers using electric add-on heat pumps and ordered Laclede to refund any and all monies collected under the interim surcharge tariff to affected customers. The order of reversal entered by the Circuit Court of Cole County was accompanied by extensive findings of fact. Those deemed most pertinent to the timely appeals of the Commission and Laclede to this court are recapitulated as follows: (1) There was no competent and substantial evidence upon the whole record to support the Commission's finding that Laclede's use of 34 degrees Fahrenheit as a "balance" or "changeover" point for the average electric add-on heat pump was reasonable; (2) There was no competent and substantial evidence upon the whole record to support the Commission's finding that Laclede would suffer a revenue deficiency by serving gas customers with electric add-on heat pumps under its current tariff; and (3) There was no competent and substantial evidence upon the whole record to support the Commission's finding that electric add-on heat pumps, due to unique and inherent operating characteristics, have an impact on Laclede's load factor different from that of other supplementary heating devices.

■ The scope of judicial review of decisions of the Commission is forged by Mo. Const. Art. V, § 18 (as amended 1976 —formerly Art. V, § 22) providing that "such review shall include the determination whether the same are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record." This constitutional mandate establishes a minimum standard of judicial review which may be statutorily broadened so long as doing so is not in conflict with or repugnant to the federal and state constitutions. *State ex rel. St. Louis Pub. Serv. Co. v. Pub. Serv. Comm'n*, 365 Mo. 1032, 291 S.W.2d 95, 101–02 (1956). Judicial inquiry into the "reasonableness or lawfulness" of decisions or orders of the Commission prescribed by § 386.510, RSMo 1978, however, is nothing more than a reaffirmation of the constitutional mandate as questions of "lawfulness" turn on whether the Commission's orders or decisions are statutorily authorized and questions of "reasonableness" turn on whether there is competent and substantial evidence upon the whole record to support them. *State ex rel. Ozark Elec. Coop. v. Pub. Serv. Comm'n*, 527 S.W.2d 390, 392 (Mo.App.1975). In the context at hand, "substantial evidence" means evidence "which, if true," has "probative force upon the issues" and "implies and comprehends competent, not incompetent evidence." *State ex rel. Rice v. Pub. Serv. Comm'n*, 359 Mo. 109, 220 S.W.2d 61, 64 (banc 1949).

■ Cognizance is also taken of certain tangential attributes associated with judicial review of orders and decisions of the Commission: (1) The decision of the Commission, not the judgment of the Circuit Court, is the subject of appellate review—*State ex rel. Pub. Water Supply Dist. No. 8 v. Pub. Serv. Comm'n*, 600 S.W.2d 147, 149 (Mo.App.1980); (2) Orders and decisions of the Commission are "prima facie" lawful and reasonable "until found otherwise" when judicially challenged—§ 386.270, RSMo 1978; (3) The party complaining of an order or decision of the Commission must "show by clear and satisfactory evidence" that the order or decision of the Commission "is unreasonable or unlawful" as the case may be—§ 386.430, RSMo 1978; and (4) Although courts on judicial review need not

defer to the Commission on questions of "lawfulness", they cannot substitute their judgment for that of the Commission where its order or decision is supported by competent and substantial evidence upon the record as a whole—*State ex rel. Util. Consumers Council of Mo., Inc. v. Pub. Serv. Comm'n*, 585 S.W.2d 41, 47 (Mo. banc 1979).

▆ The Commission and Laclede stridently contend on appeal that the surcharge tariff was, in all respects, supported by competent and substantial evidence upon the whole record, but, in the unlikely event that it was not, the trial court erred in ordering Laclede to refund to affected customers all monies collected under the interim surcharge tariff from November 1, 1982, to June 2, 1983. Relators-respondents concede in their briefs on appeal that under *State ex rel. Kansas City v. Pub. Serv. Comm'n*, 362 Mo. 786, 244 S.W.2d 110 (1951), cited and relied upon by Laclede, the Circuit Court of Cole County exceeded its authority in ordering Laclede to refund all monies collected under the interim surcharge tariff.

Perforce, as succinctly put by Laclede in its reply brief, "[a]ll of the parties to this appeal concur that the issue to be resolved by ... [the Missouri Court of Appeals, Western District] is whether or not the Commission's Report and Order is supported by competent and substantial evidence."

From Laclede's vantage point, the surcharge tariff is purportedly justified on two grounds: (1) the comprehensive nature of its General Service Rate structure; and (2) the mean or average temperature "balance" or "changeover" point at which electric add-on pumps cease to be operational. Attention first focuses on Laclede's General Service Rate structure. According to Laclede, it has an inexpensive source of gas available to meet consumer demand when the outside temperature is above 34 degrees Fahrenheit. However, when the outside temperature falls below 34 degrees Fahrenheit increased consumer demand must be met by more expensive sources of gas. Nevertheless, Laclede's rate per unit of gas to its customers remains constant as it reflects an overall margin of return for all gas consumed by an average customer on a constant rate basis. Advancing its argument a step further, Laclede asserts that its overall margin of return between the cost of gas and the rate charged is substantially narrowed by customers whose demands for gas principally occur when the outside temperature falls below 34 degrees Fahrenheit. Suffice it to say, Laclede contends that gas customers with electric add-on heat pumps constitute a class whose demands for gas substantially increase when the outside temperature falls below 34 degrees Fahrenheit. To alleviate the narrowing margin between gas rates and cost of gas ostensibly occasioned thereby, Laclede conceived the surcharge tariff on gas customers supplementing their heating needs with electric add-on heat pumps.

Attention next focuses on the mean or average temperature "balance" or "changeover" point of 34 degrees Fahrenheit seized upon by Laclede as the structural core of its proposed surcharge tariff. Relying upon syllogism and mathematical calculations, Laclede advances the proposition that a surcharge tariff of $15.00 per month for each month starting in November and ending in April (totaling $90.00) would offset its theoretically narrowing margin of return between the cost of gas and the constant rate charge occasioned by customers with electric add-on heat pumps whose gas needs must be met by gas obtained by Laclede at premium prices. At this juncture the significance of the following observations is self-evident—Laclede's use of 34 degrees Fahrenheit as a mean or average temperature "balance" or "changeover" point at which electric add-on heat pumps cease to be operational is the linch-pin of the controversial surcharge tariff. Hypothetically, if the mean or average temperature "balance" or "changeover" point at which electric add-on heat pumps cease to be operational is higher than 34 degrees Fahrenheit, then the surcharge tariff approved by the Commission is proportionally unfair and discriminatory with respect to the majority of gas customers

with electric add-on heat pumps. Conversely, if the mean or average temperature "balance" or "changeover" point at which electric add-on heat pumps cease to be operational is lower than 34 degrees Fahrenheit, then the surcharge tariff approved by the Commission is proportionately unfair and discriminatory with respect to gas customers who do not supplement their heating needs with electric add-on heat pumps.

The record in this case is fragmented with random bits of evidence regarding the temperature "balance" or "changeover" point at which various electric add-on heat pumps, subject to innumerable variables such as size, age, design, and premise insulation factors, cease to be operational. The temperature "balance" or "changeover" points mentioned run the gamut from approximately 44 degrees Fahrenheit to approximately 0 degrees Fahrenheit. There was no evidence, estimates or otherwise, of the market share of any of the various heat pumps just mentioned. In sum, none of the random bits of evidence, singularly or collectively, provided a foundation for establishing 34 degrees Fahrenheit as a mean or average temperature "balance" or "changeover" point at which electric add-on heat pumps cease to be operational.

Laclede attempts to weld the linch-pin of its surcharge tariff by emphasizing the testimony of one of its employees, who, although absent indicating or claiming any expertise in the field of electric add-on heat pumps, and absent making any "independent studies", concluded that 34 degrees Fahrenheit represented a mean or average temperature "balance" or "changeover" point at which electric add-on heat pumps cease to be operational on the basis of some "ads" he had read and what others had told him. The record has been searched in vain for other evidence, whatever its character, which could arguably be said to support 34 degrees Fahrenheit as a mean or average temperature "balance" or "changeover" point at which electric add-on heat pumps cease to be operational. It is patent that the only evidence Laclede and the Commission have to rely on to preserve the integrity of their surcharge tariff is the unmitigated hearsay heretofore mentioned.

Cases are legion that hearsay evidence does not rise to the level of "competent and substantial evidence" within the ambit of Mo. Const. Art. V, § 18. *State ex rel. DeWeese v. Morris,* 359 Mo. 194, 221 S.W.2d 206, 209 (1949); *Dickinson v. Lueckenhoff,* 598 S.W.2d 560, 561–62 (Mo. App.1980); *Wilson v. Labor and Indus. Relations Comm'n,* 573 S.W.2d 118, 120–21 (Mo.App.1978); *Bartholomew v. Bd. of Zoning Adjustment,* 307 S.W.2d 730, 733 (Mo.App.1957); *State ex rel. Horn v. Randall,* 275 S.W.2d 758, 763 (Mo.App.1955); and *Dittmeier v. Missouri Real Estate Comm'n,* 237 S.W.2d 201, 206 (Mo.App. 1951).

Laclede and the Commission seek to avoid the fatal consequence of the evidentiary deficiency by the classic hue and cry of virtually limitless discretion possessed by the Commission, the admonition that courts should not substitute their judgment for that of the Commission, and the indulgence of deference for decisions of the Commission because of its expertise in the complicated and highly sophisticated matters it is legislatively ordained to resolve. Judicial recognition thereof when and where appropriate, however, does not dictate blind acceptance of every order cut and every decision handed down by the Commission. Indiscriminate approval of orders and decisions of the Commission, without subjecting them to the rigors of Mo. Const. Art. V, § 18, is an abdication of judicial responsibility. Unbridled bureaucracy is the subtle destroyer of people's rights and Mo. Const. Art. V, § 18, is their response.

Having concluded that there was no "competent and substantial evidence" upon the whole record to support a finding by the Commission that 34 degrees Fahrenheit was a mean or average temperature "balance" or "changeover" point at which electric add-on heat pumps cease to be operational, the surcharge tariff sought by Laclede and approved by the Commission falls apart for want of a linch-pin. Perforce, the

Circuit Court of Cole County was eminently justified when it invalidated the surcharge tariff on the ground heretofore discussed.

Although it is unnecessary from a dispositional standpoint to analyze or discuss the other invalidating grounds relied on by the Circuit Court of Cole County, one in particular merits special attention because of its potential aftermath. The Circuit Court of Cole County concluded that there was no competent and substantial evidence to support a finding by the Commission that users of electric add-on heat pumps legally constituted a separate, distinct class for rate purposes and, concomitantly, the surcharge tariff was discriminatory.

Section 393.130.3, RSMo 1978, provides, inter alia, that no "gas corporation" shall subject "any particular person, corporation or locality or any particular description of service to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." Admittedly, " '[a] discrimination as to rates is not unlawful where based upon a reasonable classification corresponding to actual differences in the situation of the consumers or the furnishing of the service.' " *Smith v. Pub. Serv. Comm'n*, 351 S.W.2d 768, 771 (Mo.1961). The court in *Smith* goes on to point out, however, that " 'the reasonableness of the basis of the classification must appear; and whether a discrimination is unlawful and unjust or the circumstances substantially dissimilar is usually a question of fact.' " Id. 771. Thus, justification vel non for grouping gas customers with electric add-on heat pumps into a separate rate class goes full circle and raises the specter of whether competent and substantial evidence existed to support the classification as reasonable. Briefly, Laclede and the Commission submit that electric add-on heat pumps possess "distinguishing characteristics" which are "inherently determinable" by virtue of being designed to totally eliminate the use of gas for heating purposes for prolonged periods of time as opposed to other supplemental heat devices, e.g. kerosene space heaters, wood burning fireplaces and solar units. This court observes, in the frame of reference at hand, that the evidence relied upon by Laclede and the Commission to fill the role of "competent and substantial evidence" treads dangerously close to, if not in, the quicksands of speculation, conjecture and surmise.

There is no escape from the fact that the innovative features of electric add-on heat pumps have brought about a head-on confrontation between manufacturers and users of electric add-on heat pumps on the one hand and consumer oriented natural gas utilities on the other hand. This court is not so naive as to believe that the instant opinion has put this confrontation to final rest. This court is also aware that a seasonal rate differential, i.e., a lower rate applicable when the outside temperature is 34 degrees Fahrenheit or better and a higher rate applicable when the outside temperature is below 34 degrees Fahrenheit, would probably be looked upon with disfavor by Laclede because of its adverse psychological impact upon its gas customers. Psychologically, the marketplace is geared to quantity discounts not increases.

A few conclusionary remarks are in order regarding Laclede's contention, and Marco's acquiescence therein, that under *State ex rel. Kansas City v. Pub. Serv. Comm'n, supra*, the trial court erred in ordering Laclede to refund to affected customers all monies collected under the interim surcharge tariff from November 1, 1982, to and including June 2, 1983. The controversial surcharge tariff was not suspended during the pendency of the writ of review pursuant to § 386.520, RSMo 1978. Both the instant case and *State ex rel. Kansas City v. Pub. Serv. Comm'n*, supra, are distinguishable from *State ex rel. Util. Consumers Council of Mo., Inc. v. Pub. Serv. Comm'n, supra*. Having concluded that *Kansas City* rather than *Consumers Council* controls, it necessarily follows that the trial court erred in ordering Laclede to refund all monies collected under the interim surcharge tariff from November 1, 1982, to and including June 2, 1983.

That portion of the order or judgment of the Circuit Court of Cole County reversing and invalidating the interim surcharge tariff on gas customers with electric add-on heat pumps sought by Laclede and approved by the Commission on October 20, 1982, effective March 1, 1982, is hereby affirmed; however, that portion of the order or judgment of the Circuit Court of Cole County ordering Laclede to refund to affected customers all monies collected under the interim surcharge tariff from November 1, 1982, to and including June 2, 1983, is reversed.

Judgment affirmed in part and reversed in part.

PRITCHARD, P.J., concurs.

KENNEDY, J., dissents in separate dissenting opinion.

KENNEDY, Judge, dissenting.

I am unable at several points to agree with the majority opinion. I would reverse the trial court judgment and would reinstate the order of the Commission.

*The validity of separate classification of heat pump users for gas tariff purposes. Scope of judicial review of Public Service Commission order.*

I think the first question which must be decided here, and which the majority opinion leaves open, is whether the imposition of a surcharge upon a heat pump user is permitted at all. If that question is not decided, the parties are left in doubt, even if competent and substantial evidence were to establish (as the majority opinion says it does not) the proper changeover point, whether the establishment of a different rate structure for heat pump users is a permissible classification. The question is presented here. It should be decided.

This is a tremendously expensive case, involving hundreds of hours' time and corresponding expense. Must the parties start over, present their case again to the Commission, and go through the appeal process again—only to find out on a second trip to this court that the classification was arbitrary and capricious and therefore impermissible?

So I would, first of all, decide that most basic point.

Second, it should be decided to approve the classification, for the following reasons:

The Commission decided that the separate classification for heat pump users was a permissible classification, against the contention of the heat pump side of this case that the surcharge constituted a discriminatory and unreasonable classification. I would hold that the classification is permissible, and that the order of the Commission could not be set aside as unlawful on the ground that the classification was arbitrary and unreasonable.

If we had been sitting as a Commission deciding this case originally, we might have decided that as a matter of regulatory policy, the heat pump surcharge should not be allowed. But we may not, sitting as a reviewing court, substitute our judgment for that of the Commission. We may not in our reviewing role so limit the Commission's discretion. The business of utility regulation is a highly complex business. A reasoned decision on the question of the heat pump surcharge calls for a balancing of a wide range of economic and social factors, done by arbiters whose experience and learning equip them for that task. Ours is a more limited role; we review only for "unlawfulness" or "unreasonableness". Sec. 386.510, RSMo 1978. It has become trite to say, and yet we need continually to remind ourselves, that we may not substitute our judgment for that of the Commission in matters which have been entrusted to it by law. *State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission*, 585 S.W.2d 41, 47 (Mo. banc 1979); *State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission*, 606 S.W.2d 222, 223 (Mo.App.1980), cert. denied, 450 U.S. 1042, 101 S.Ct. 1761, 68 L.Ed.2d 240 (1981).

On this record I am unable to say that there is anything unlawful or unreasonable about the classification which places heat

pump users in a separate category for purposes of the surcharge. It is not an arbitrary or a capricious classification; it is based upon realistic differences between the gas consumer with heat pump and the gas consumer without heat pump.[1] The former uses less gas and what he uses is more expensive gas at the wholesale level. The heat pump user begins to use gas in quantity only when the temperature goes below 34 degrees Fahrenheit, which is the point at which Laclede begins to draw upon its more expensive gas. The "peak demand factor" for heat pump users is 30 percent higher than for non-heat pump users. (The "peak demand factor" is arrived at by dividing amount used in January, the coldest month, by $\frac{1}{11}$ of the amount used during the other 11 months.)

There was no dispute that the gas company's revenue for gas sales to heat pump customers was insufficient. Only the amount of the shortfall was debated. The Commission found, upon ample evidence, that that shortfall was $90 per annum. The surcharge was fixed to compensate for that. If the utility's cost of the gas is evenly distributed over the more expensive and the less expensive gas, and evenly distributed (per unit) over the entire customer base, then the customer who uses both the more expensive and the less expensive gas (i.e., the non-heat pump user) is subsidizing the customer who uses only the more expensive gas (i.e., the heat pump user)—or else the gas company is receiving less in rates than it is entitled to receive. The surcharge is a way of re-allocating the cost more equitably among residential gas users. The wisdom of the surcharge may be debatable—but that is only to say that it is not arbitrary, and therefore that it is not to be overturned by the reviewing court.

The majority opinion takes seriously the surcharge opponents' contention that heat pumps are not unlike other auxiliary heat sources, such as stoves, burning wood, coal or kerosene, fireplaces or solar devices. The Commission, however, plausibly and correctly found that the heat pump principle, in its effect upon Laclede's cost of supplying gas, was inherently different from that of such other auxiliary heating devices. Unlike the predictable and measurable impact of the heat pump, the impact of the other devices is entirely random. Their use depends upon many variables other than the outside temperature, including the user's supply of fuel and individual preference or taste. They typically are used in only one room, not in the whole house. Of course, when these devices save gas they are as likely to save it at the coldest temperatures (when Laclede's gas costs are at the highest) as at the warmer, adding nothing at all to the peaking factor which is the real mischief-maker from Laclede's standpoint. There is nothing arbitrary or capricious about treating heat pumps differently than those devices.

*Competence and substantiality of evidence to support Commission order.*

Passing over the question whether Mr. Davis's testimony alone would have been sufficient to support the Commission's finding (as I believe it was and as the majority opinion holds it was not), the use of the 34-degree-Fahrenheit changeover point as *falling within a reasonable range* was supported by other evidence in the record. Witnesses for the surcharge opponents who were undoubtedly qualified as experts in technical operation of heat pumps gave testimony which would support the range of 44 degrees Fahrenheit on the high side and 27 degrees Fahrenheit on the low side.

---

1. *Compare State ex rel. City of St. Louis v. Public Service Commission,* 327 Mo. 318, 36 S.W.2d 947 (1931), where Southwestern Bell converted its telephone system from a manually operated switchboard to a dial or "automatic" system. In doing so, it equipped with a dial at no charge (1) individual line subscriber telephones and (2) the switchboard of private branch exchange (PBX) subscribers. In contrast, Southwestern Bell charged 25 cents per telephone to equip with a dial any individual station telephones connected to the PBX subscriber's switchboard. The Commission found and the court held not unjustly discriminatory (1) the differing rate treatment under the new system of individual line subscribers and PBX subscribers and (2) the 25 cents per station telephone charge to PBX subscribers under the new system when under the old system PBX users received the same service without the added charge.

This testimony was given to support a higher changeover temperature than 34 degrees Fahrenheit, if there should be any surcharge at all. The reason for such testimony from the surcharge opponents was that the higher changeover point would result in a smaller revenue deficiency and therefore a smaller surcharge. Mr. Wagner, an electrical engineer and special projects manager for Union Electric, opted for a 40-degree-Fahrenheit changeover point which would result, he calculated, in a revenue deficiency of $77.78 per heat pump customer per annum as opposed to $95.70 at the 34-degree level. His studies included only those two temperatures. Electrical Engineer and Energy consultant Jurgen Worthing, testifying for surcharge opponent Marco Sales Co., computed customer heating costs and savings based upon only three different hypothetical changeover temperatures—43 degrees, 32 degrees, and 27 degrees. A Union Electric advertisement in the record uses a changeover point of "30 degrees or so".

This is an abundance of evidence to show that the 34-degree changeover point is a reasonable one, *particularly* when one takes it into account that the trier of fact is itself an expert in the field in which the witness is testifying. It may use its own expert knowledge, not to supply missing evidence, but to evaluate evidence. 73A C.J.S. Public Administrative Law and Procedure §§ 127(b), 130 (1983); *Gaddy v. State Board of Registration for Healing Arts*, 397 S.W.2d 347, 355 (Mo.App.1965).

The majority opinion seems to proceed on the erroneous assumption that various units have changeover points ranging from a high of 44 degrees Fahrenheit down to -2 degrees Fahrenheit. It points out that there is no evidence as to how many of each are in use. The idea seems to be that such evidence is necessary to enable the Commission to determine with a degree of mathematical nicety the mean or average changeover point.

Any such study would be wholly useless. While the various units may be capable of operating between the temperatures of 44 degrees Fahrenheit and -2 degrees Fahrenheit, the actual changeover points fall within a much narrower range. They are set by the owner at the desired temperature. The two factors which go into his selection of a changeover temperature are bodily comfort and economics. These considerations indicate a changeover point falling within a range of 43 degrees Fahrenheit to 27 degrees Fahrenheit. This is established by the expert witnesses of the opponents of the heat pump surcharge, earlier referred to.

It was not necessary for the purpose of tariff design to establish with mathematical exactitude the changeover temperature at which the heat pump customers with a higher changeover point and those with a lower changeover point would be in exact equilibrium. All in all, the selection of the 34-degree temperature as the changeover point for the purpose of fixing the amount of the surcharge was reasonable.

*Remand instead of outright reversal*

If we are to reverse this decision on the *evidence point*, it should not be reversed outright. It should be remanded to the Commission for rehearing on the limited issue of the correct changeover point. It should be reversed outright only if we decide the basic issue—the permissibility of the classification—adversely to the Commission's decision.

Davis's opinion that 34 degrees Fahrenheit was a proper changeover point—which the majority opinion says he was not qualified to give—was in the record, before the Commission, *with no objection*. The first objection comes on appeal. If we are to exclude this evidence, and hold that its absence leaves Laclede without a submissible case, we should remand.

We have decided, however, that the case should be remanded for a new trial rather than to remand with directions to enter judgment for defendant. While we cannot point to any available evidence that might enable plaintiff to make a submissible case, we can understand that plaintiff's counsel, having the positive testimony of a witness which, if accept-

ed, would have been sufficient to supply the essential proof, may not have presented all available evidence (particularly of an expert nature) which might aid plaintiff in making a stronger showing.

*Prince v. Bennett*, 322 S.W.2d 886, 891 (Mo.1959).

I would hold that the Commission's decision is abundantly supported by the evidence. But if we reverse on the evidence point, I believe the case should be remanded to the Commission for rehearing on the limited issue of the correct changeover point.