**STATE of Missouri, ex rel. CITY OF LAKE LOTAWANA, et al., Respondents,**

v.

**The PUBLIC SERVICE COMMISSION OF the STATE of Missouri, and United Telephone Company of Missouri, a corporation, Appellants.**

**No. WD 38518.**

Missouri Court of Appeals, Western District.

May 5, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 30, 1987.

Linda K. Ohlemeyer, Jefferson City, for Missouri Public Service Com'n.

Jeremiah D. Finnegan, Hugh F. O'Donnell, III, Kansas City, for respondents.

Before KENNEDY, P.J., and BERREY and GAITAN, JJ.

KENNEDY, Presiding Judge.

The present appeal involves an order of the Public Service Commission which ordered, among other rate adjustments, a 97 percent increase of telephone rates for optional Extended Area Service in the Lake Lotawana exchange served by United Telephone Company of Missouri. Extended Area Service ("EAS") is a service wherein, for a flat monthly fee, the consumer in one telephone exchange is able to make and receive an unlimited number of telephone calls from an area beyond the exchange boundaries. In the case of the Lake Lotawana exchange, the EAS extends between such exchange and the Kansas City Metropolitan exchanges. EAS can be either nonoptional, where all consumers in a particular exchange are automatically subscribers; or optional, where the consumers in a particular exchange can choose to subscribe the service or not.

In the Lake Lotawana exchange EAS was optional—that is, a subscriber could elect to have such service or not. It was the only Missouri exchange served by Unit-

ed where such EAS was available as an option. If he elected EAS, a residential customer was charged a flat monthly rate (in addition to his regular local exchange rate) of $20, and a business customer was charged an additional $25. (In other exchanges, unlike Lake Lotawana, EAS was non-optional. It was part of the regular service furnished to telephone customers and was included in the regular local exchange rate.) The $20–$25 rate was the prevailing rate until the PSC order of October 21, 1985, which took effect on October 28, 1985. The order increased the optional EAS rate for the Lake Lotawana exchange from $20 to $39.35 per month for residential customers and from $25 per month to $49.20 for business customers.

The procedure leading up to the order was as follows: The telephone company on February 4, 1985, filed its tariff with rate adjustments which were designed to increase overall Missouri revenue by 41 percent. The tariff filed by the telephone company did not make any change in the optional EAS rates for Lake Lotawana customers.

The proposal to increase the Lake Lotawana EAS rates first showed up in the PSC staff testimony, filed in August, 1985, which proposed "that optional EAS in the Lake Lotawana exchange either be eliminated or increased by 97 percent". Staff supported its proposal by the rationale that optional EAS was actually a "discounted toll plan". Reasoning that toll rates had increased 97 percent since the optional EAS rates for Lake Lotawana had been fixed in 1968, staff proposed that the Lake Lotawana optional EAS, if continued, be increased by a similar percentage.

No specific notice of this proposal was given to Lake Lotawana, which is the cause of one of Lake Lotawana's most urgent complaints. We do not reach that issue.

In September 1985 the staff, the telephone company and the public counsel filed a stipulation proposing the elimination of optional EAS for the Lake Lotawana exchange. This stipulation was rejected by the Commission. The same parties then entered into an amended stipulation where-

in it was proposed that the optional EAS rates for Lake Lotawana be increased by 97 percent. The amended stipulation was adopted by the Commission order of October 21, 1985, which ordered the telephone company to file tariffs increasing the optional EAS rates for Lake Lotawana exchange by 97 percent—from $20 to $39.35 per month for the residential customer, and from $25 to $49.20 for the business customer.

On October 25, 1985, Lake Lotawana (as well as respondents City of Oak Grove, City of Buckner, City of Sibley, County of Jackson and the 249 Phone Committee) filed applications to intervene out of time and filed motions for rehearing. All said motions were denied after hearing.

This appeal followed. The circuit court reversed and set aside the Commission's order on the ground that it was not supported by competent and substantial evidence.

The Public Service Commission and the telephone company have appealed to this court. Only the Commission has filed an appellant's brief. United's omission of a brief may be explained by the fact that the rate increase will actually result in a loss of revenue from this particular service because of a loss of subscribers.

The case brings into play two interrelated principles. They are that rates fixed by the Commission may not be "unreasonable" and they may not be "unjustly discriminatory". § 392.240.1, RSMo 1986. *State ex rel. DePaul Hospital School of Nursing v. Public Service Commission,* 464 S.W.2d 737 (Mo.App.1970). The commission's order with respect to Lake Lotawana's EAS rate increase, as we shall show, collides with those principles.

**I**

Lake Lotawana complains that the EAS rate increase is discriminatory in that the resultant rate is more than the rate for the same service rendered to Ferrelview exchange residents. Ferrelview is another exchange served by United and it is comparable to Lake Lotawana in number of cus-

tomers served and in its relation to Kansas City. Lake Lotawana points out that a Ferrelview subscriber and the Lake Lotawana subscriber can each call toll free to (and receive calls toll free from) the Kansas City metropolitan exchanges, and thus have the same calling scope, but the Lake Lotawana EAS business subscriber under the challenged order pays $41.90 per month more ($7.30 Ferrelview as against $49.20 Lake Lotawana) and the residential subscriber pays $35.70 more ($3.65 Ferrelview as against $39.35 Lake Lotawana) than their counterparts on the Ferrelview exchange.

The Commission in overruling respondent's motion for rehearing based its rejection of this argument on the fact that the Lake Lotawana exchange offers *optional* EAS, which the subscriber may elect to take or not to take, while Ferrelview furnishes nonoptional EAS to all subscribers. The cost of the service, said the order, is therefore spread over a larger base in the Ferrelview exchange.

The Commission, however, according to its brief here, did not fix Lake Lotawana's optional EAS rate on the cost recovery basis, which was the basis for fixing the Ferrelview nonoptional EAS service rate (but with a cap to prevent "rate shock"). For Lake Lotawana's optional EAS, it used instead the standard applicable to the discounted toll service. Discounted toll service is an optional service by which customers may receive and originate calls between certain exchanges at an approximate 25 percent discount from the normal toll rates. Discounted toll service rates are of course fixed in relation to normal toll service. Since the toll service had increased 97 percent since 1968, when Lake Lotawana's optional EAS rate had last been fixed, that increase was applied to Lake Lotawana's optional EAS rate.

Despite its appeal position that the Lake Lotawana EAS rate was fixed with reference to the discounted toll standard, the Commission's order overruling Lake Lotawana's motion for rehearing seemed to seek to justify it on a recovery of cost basis. The order explained:

The EAS for the Ferrelview exchange is nonoptional and therefore is not comparable to the Lake Lotawana optional EAS service. Nonoptional and optional EAS are not comparable. All customers within an exchange pay for nonoptional EAS and so the costs are spread over a larger customer base. Since optional EAS is not charged to each customer in an exchange, the cost per customer is greater and the possibility of recovering the costs are less since customers may choose not to take the service. This option makes the service more advantageous to the customer and less so to the company. This optional feature causes more costs per customer than does the nonoptional service.

The implication of this explanation is that the cost of furnishing the service has been the predominant factor in fixing the rate.

The Commission did not in its order, and does not in its brief here, attempt to justify the wide difference in Ferrelview EAS rates and Lake Lotawana EAS rates on any other than the optional-nonoptional basis.

This reference to United's cost of supplying the service is in line with its order of June 3, 1974, in Case No. 17,898, In the Matter of the Investigation of All Factors Relative to the Calling Scope of All Telephone Exchanges in Missouri. That order stated in part:

In determining the rate to be charged the Commission will consider (1) any additional investment required, (2) carrying charges on that additional investment, (3) the return requirement on the additional investment, (4) any loss in toll revenues anticipated, and (5) the proper rate group charges.

What was the evidence of the respective costs of service in this case? For Ferrelview, the costs computed by United and by the PSC staff respectively were $10.84 and $10.97 for residential service, and for business service $21.78 and $21.94. Staff did not compute the cost of furnishing Lake Lotawana the optional EAS service, but United computed it at $4.18 residential and $8.37 business. Thus United's cost of furnishing the Lake Lotawana service was less than half the cost of furnishing the

Ferrelview service, but the revised rate for the Lake Lotawana service is more than ten times as much as for the Ferrelview residential customer, and nearly seven times as much for the business customer. The reasons given by the Commission itself for the difference between Ferrelview and Lake Lotawana rates, in its order overruling Lake Lotawana's motion for rehearing, are therefore not supported by the evidence. Indeed, even without the Ferrelview comparison, it would be difficult on this evidence to sustain the revised Lake Lotawana optional EAS rate as reasonable.

The Commission in its brief does not try to explain the revised Lake Lotawana rate by the cost of the service, as noted earlier, but undertakes to justify it by comparing it with a discounted toll rate. The Commission was not confined to the recovery of cost standard, of course. Within a wide range of discretion the Commission may select the methodology. *State ex rel. Associated Natural Gas Co. v. Public Service Commission,* 706 S.W.2d 870, 880 (Mo. App.1985); *State ex rel. Missouri Public Service Co. v. Fraas,* 627 S.W.2d 882, 888 (Mo.App.1981). It may select a combination of methodologies.[1] The discounted toll rate is provided under the Metropolitan Optional Service Plan ("MOSP"). This is an optional discounted toll plan for selected exchanges surrounding the metropolitan areas of Kansas City, Missouri. The plan had been introduced to provide a discounted toll service in lieu of flat rate EAS service. Due to the fact that the revenues are booked to a local revenue account, the service may be considered a "usage sensitive" EAS plan. MOSP was in effect in the Kearney and Buckner exchanges, and the Commission order which includes the Lake Lotawana rate revision under review here provides also for the establishment of such service for Lake Lotawana. MOSP would allow the customer to choose a maximum of 150 units (minutes, presumably) for a

monthly rate of $9.45; 300 units for a monthly rate of $18.90; or 450 units for a monthly rate of $28.35. The rates for this service are fixed relative to regular toll rates.

Optional EAS does to be sure have some similar features to a discounted toll plan. Like the discounted toll plan it provides for a flat monthly rate and thereby, depending upon the customer's usage, allows him to effect some saving over regular toll service. Like optional EAS, MOSP is optional with the customer. If there are other points of similarity, they do not appear in this evidence.

The dissimilarities are more striking than the similarities. EAS, optional or nonoptional, is an unlimited usage two-way flat-rate calling plan. MOSP, on the other hand, is one way, from the Lake Lotawana customer to the metropolitan exchanges, but not from other telephones in the metropolitan exchanges to Lake Lotawana. MOSP gives *limited* calling privileges, the limit depending upon which of three options he takes. EAS, on the other hand, gives unlimited usage. It appears to the non-expert that optional EAS is more like nonoptional EAS than it is like MOSP—but the fact is, it is neither. It is sui generis and, on the record before us, the simple expedient of adding 97% (the toll service increase since 1968, when Lake Lotawana's optional EAS rate was established) to the prevailing EAS rate is not justified by this evidence. Even if one could justify the parallel between toll service and EAS, there is no evidence at all as to whether the prevailing $20–$25 rates, to which the 97% was added, were originally arrived at on that basis. As a matter of fact, Mr. Smith, representing United, said:

> My understanding is that the (prevailing) rate—I guess that the reason there hasn't been any increase suggested there is that because service was installed so

---

**1.** "No writer whose views on public utility rates command respect purports to find a single yardstick by sole reference to which rates that are reasonable or socially desirable can be distinguished from rates that are unreasonable or adverse to the public interest. A complex of tests of acceptability is required, just as would be the case with the tests of a good automobile,

a good income-tax law, or a good poem." J. Bonbright, *Principles of Public Utility Rates* 67 (1961).

*See State ex rel. Missouri Public Service Co. v. Pierce,* 604 S.W.2d 623, 625 (Mo.App.1980) *and State ex rel. City of St. Louis v. Public Service Commission,* 327 Mo. 318, 36 S.W.2d 947, 948 (1931).

long ago that we feel that the rate is still compensable ... But I believe that's the reason it hasn't been sought to be increased. It's the only service like that we have in the entire state. I don't know why it was put in in the first place and at those rates. I don't know if there was a cost study made then or not. I don't know what supports that rate.

The reviewing court is often faced with the question what lack of evidence can be supplied by the expertise of the Commission. No clear line can be drawn from the cases. *See State ex rel. Marco Sales v. Public Service Commission,* 685 S.W.2d 216, 222 (Mo.App.1984) (Kennedy, J., dissenting). We go to considerable lengths to give deference to the expertise of the Commission. Furthermore, we acknowledge the restrictive scope of judicial review, which accords to the Commission's orders every presumption of correctness and places a heavy onus upon its challengers to demonstrate its error, *State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission,* 585 S.W.2d 41, 47 (Mo. banc 1979); *State ex rel. Public Water Supply District No. 8 of Jefferson County v. Public Service Commission,* 600 S.W.2d 147, 153 (Mo.App.1980). But if judicial review is to have any meaning, it is a minimum requirement that the evidence, along with the explanation thereof by the witnesses and by the Commission itself, make sense to the reviewing court. We may not approve an order on faith in the Commission's expertise. *See State ex rel. Marco Sales v. Public Service Commission,* 685 S.W.2d 216, 220 (Mo.App. 1984). Viewed in that way, we are unable to approve as reasonable the challenged portion of this order.

The judgment of the circuit court is affirmed, and the case is remanded to the Public Service Commission for such further proceedings, consistent with this opinion, as may be indicated.

All concur.