STATE ex rel., U.S. WATER/LEXING-TON and State ex rel., Office of the Public Counsel, Appellants,

v.

MISSOURI PUBLIC SERVICE COMMISSION, Respondent.

No. WD 42919.

Missouri Court of Appeals, Western District.

Aug. 28, 1990.

Gary W. Duffy, Jefferson City, for U.S. Water/Lexington.

Lewis R. Mills, Jefferson City, for Office of Public Counsel.

William Keith Haas, Jefferson City, for respondent.

Before LOWENSTEIN, P.J., and CLARK and FENNER, JJ.

FENNER, Judge.

Appellant, U.S. Water/Lexington, Missouri, Inc., (USW), is a public utility subject to regulation by the respondent, Public Service Commission (Commission). USW sought a revenue increase of $195,000 in rates for water service provided to customers in and around Lexington, Missouri. Following an evidentiary hearing, the Com-

mission issued its Report and Order which, in its final form, granted USW a revenue increase of $85,956. USW appealed to the Circuit Court of Cole County where the Commission's Order was affirmed.

USW now appeals from the judgment of the circuit court. The appeal centers on the cost of debt financing used by the Commission in approving the revenue increase.

■■■ It is the decision of the Commission and not the judgment of the circuit court that is the subject of appellate review. *State ex rel. Marco Sales v. Public Service Commission*, 685 S.W.2d 216, 218 (Mo.App.1984). The scope of judicial review in an appeal from a decision of the Commission is to determine the lawfulness and reasonableness of the order of the Commission. § 386.510, RSMo 1986. The burden of proof is upon the party seeking to set aside the order of the Commission to show by clear and satisfactory evidence that the Order complained of is unreasonable or unlawful. § 386.430, RSMo 1986. Questions of lawfulness turn on whether the Commission's Order is statutorily authorized and questions of reasonableness turn on whether there is competent and substantial evidence upon the whole record to support the Order. *State ex rel. Marco Sales*, 685 S.W.2d at 218. The courts on judicial review cannot substitute their judgment for that of the Commission where its order is supported by competent and substantial evidence upon the record as a whole. *Id.* at 219. Decisions of the Commission on factual issues are presumed correct. *Love 1979 Partners v. Public Service Commission*, 715 S.W.2d 482, 486 (Mo. banc 1986).

The evidence before the Commission was that on December 20, 1983, Missouri Water Company sold its utility plant at Lexington, Missouri, to The Utility Group, Inc., (TUG), for $122,800 plus accounts receivable in cash and a non-interest bearing note of $1,063,339 due December 20, 1988. TUG then transferred its newly acquired assets to its wholly-owned subsidiary USW in exchange for all of the common stock of USW. This sale and transfer of assets was approved by the Commission.

In November, 1988, TUG obtained a loan commitment from J.C. Nichols Company (Nichols) for $1,400,000. The loan was to be secured by the stock of USW. The loan proceeds were to be used to refinance by retiring existing loans from Nichols and Missouri Water Company. The loan commitment called for interest at 13.75% and for a loan fee of $35,000. USW did not attempt to secure financing on its own.

In its Report and Order, the Commission adopted the evidence presented by the Commission Staff (Staff) in support of an imputed rate of interest of 13% for refinancing to arrive at an embedded cost of long term debt of 12.26%.

■■ In their first point on appeal, USW argues (1) that the Commission erred in determining their cost of debt by using a hypothetical cost that is not supported by the evidence and (2) that the Commission's findings on this issue are insufficient to allow for effective review.

Jay Moore, a Financial Analyst for the Commission, testified that the loan commitment from Nichols which had an embedded cost of debt of 14.25% was "too excessive" for a regulated utility company in the then current economic climate. Moore testified that fourteen small Missouri utilities had borrowed debt between 1976 and 1988 at an average spread of 2 points above the prime interest rate.

Moore testified that the prime interest rate at the time of the Nichols loan commitment was 10.5%. The Commission's adoption of Staff's imputed interest rate of 13% was 2.5 percentage points above the prime rate of 10.5%. Moore testified that the 2.5% spread included .5% to compensate for TUG's equity ratio being lower than the other small utilities having debt and to allow for any commitment fees.

The Commission's determination of an imputed rate of interest of 13% for USW's cost of debt was supported by the evidence. The first part of USW's first point is denied.

In the second part of USW's first point, it argues that the Commission's findings are insufficient to allow for effective review.

■ In reviewing the sufficiency of the Commission's findings it is required that the findings be sufficiently definite and certain under the circumstances of the case to enable the court to review the decision intelligently and ascertain if the facts afford a reasonable basis for the order without resorting to the evidence. *Office of the Public Counsel v. Missouri Public Service Commission,* 782 S.W.2d 822, 825 (Mo.App. 1990).

■ The findings of the Commission reflected that their Staff had observed many ties between Nichols and the shareholder of the consolidated companies, TUG and USW. That Staff was concerned that the negotiated interest rate with Nichols might not have been the product of an arms-length negotiation. As a result of their concern over these ties, the Commission Staff examined the previously mentioned fourteen small Missouri utilities that had borrowed debt between 1976 and 1988. The Commission's findings reflected that the examination revealed that the average interest rate at which these companies had borrowed money was two points above the prime interest rate. The Commission found their Staff's analysis to be sound and that it was reasonable to adopt an imputed rate of interest of 13% for USW's cost of debt.

The Commission's findings were not deficient and there was no question as to the basis of their decision in this aspect of the case. The second part of USW's first point is denied.

■ In their second point, USW argues (1) that the Commission erred in concluding that the cost of debt should be determined based upon data from comparable utility companies because there was no evidence to show that the companies were in fact comparable and (2) in concluding that the many ties alleged with Nichols justified an interest rate other than that negotiated.

The evidence was that the fourteen Missouri utilities reviewed were all small utilities. In 1987, USW had total assets of $1,789,369 and an estimated rate base of $1,542,198. The other fourteen utilities reviewed all had less total assets or an estimated rate base less than USW's 1987 figures, or both, less total assets and a lesser estimated rate base. The composite group's 1987 average common equity ratio was 31.01%. A common equity ratio of 22.87% was utilized in the case at bar which is lower than the composite group. However, six of the fourteen composite group companies reported ratios lower than 23.87%. Furthermore, as mentioned previously, .5% was added to compensate for TUG's lower equity ratio and to allow for any loan commitment fees.

The evidence showed that the companies were comparable. The first part of USW's second point is denied.

■ In reference to the ties with Nichols, the evidence showed that during 1982 through 1984, Charles Schleicher personally borrowed and then advanced a total of $300,000 to Utility Associates, Ltd., for working capital and expenditures in purchasing private water companies. U.S. Utilities, Inc., a wholly-owned subsidiary of Nichols, was the general partner in Utility Associates, Ltd.; Nichols and Charles Schleicher were two of the three limited partners. The stock of TUG was owned by this partnership until January, 1985, when the stock was transferred to Charles Schleicher and his wife, Jane Schleicher.

The assets of the Lexington division of Missouri Water Company were acquired by TUG, and transferred, as a capital contribution, to USW on December 20, 1983. The then president of TUG, who executed the purchase money note to Missouri Water Company, is the treasurer of Nichols. TUG borrowed an additional $209,661 from Nichols to fund the rest of the purchase price. To secure its cash loan and signed promissory note, Nichols took a security interest in all of the issued capital stock of USW.

In 1985, TUG borrowed an additional $308,000 with which TUG purchased the

personal notes of Charles Schleicher. During 1987, TUG borrowed a total of $200,000 from Nichols. From this $200,000 loan, $147,000 was transferred to USW to repay advances and $53,000 was advanced as an interest free personal loan to Charles Schleicher.

Although there were no payments made to reduce the principal of the interest-free purchase money note to Missouri Water Company, approximately one-half of the $717,661 principal amount borrowed from Nichols had been paid off at the time of refinancing.

In addition to refinancing of the purchase money note to the Missouri Water Company, the loan commitment from Nichols includes refinancing of the balance due Nichols in excess of $300,000 in loans outstanding to TUG. These outstanding loans have a 10% interest rate as opposed to the 14.25% annualized cost of debt of refinancing with Nichols.

TUG contacted only two potential lenders to refinance the purchase money loans: a savings and loan company and Nichols. Additionally, the evidence reflects that Mr. Schleicher's law firm is tax counsel to Nichols on a specific assignment basis.

Furthermore, contrary to USW's assertion, the Commission did not find that the ties with Nichols justified an interest rate other than that negotiated. The Commission merely recognized their Staff's concern over the ties with Nichols as the basis of their Staff's investigating to determine if a different rate of interest should be imputed in establishing a reasonable interest rate for USW's cost of debt.

The second part of USW's second point is denied.

In their third point, USW argues (1) that the Commission erred by ignoring the "uncontroverted and relevant" negotiated interest rate of 14.25% and (2) that the Commission made no specific finding that this "undisputed" evidence of a negotiated rate of 14.25% was not credible.

■ As pointed out previously herein, the Commission clearly addressed the negotiated rate of interest of 14.25% and it was not ignored by the Commission. Furthermore, the Commission is not bound to accept whatever cost of debt is "negotiated" and presented to it.

■ The Commission may not abdicate its power to set just and reasonable rates. The rate-making process requires the Commission to determine the utility's cost of capital, which includes service on debt. *State ex rel. Associated Natural Gas Company v. Public Service Commission*, 706 S.W.2d 870, 873 (Mo.App.1985). The statutory power and authority which the Commission has to pass upon the lawfulness and reasonableness of rates and to determine and pass upon the question of what rates are necessary to permit a utility to earn a fair and reasonable return necessarily includes the power and authority to determine and decide what treatment should be accorded such expense items. *State ex rel. City of West Plains v. Public Service Commission*, 310 S.W.2d 925, 928 (Mo. banc 1958). The Commission can select its methodology in determining rates and can make pragmatic adjustments as called for by particular circumstances. *State ex rel. Associated Natural Gas Company*, 706 S.W.2d at 880.

USW's third point is denied.

In its fourth and final point, USW argues that the decision of the Commission to impute an interest rate for USW's cost of debt results in an unconstitutional confiscation in that it does not allow sufficient funds for the company to maintain financial integrity.

An essential function of the Commission in the rate-making process is to determine an appropriate rate of return. Typically, the rate of return is designed to provide sufficient revenue to cover the utility's total cost of service. Such costs include both the operating expense for the utility and an adequate return on the investment in property and equipment serving the public. *Id.* at 872. "The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate under efficient and economical management, to maintain and support its

credit and enable it to raise the money necessary for the proper discharge of its public duties." *Id.* at 873, quoting *Bluefield Waterworks & Improvement Company v. Public Service Commission*, 262 U.S. 679, 693, 43 S.Ct. 675, 679, 67 L.Ed. 1176 (1923).

When a utility challenges a rate established by the Commission as confiscatory the utility has the burden of proof and the Commission's order will not be set aside unless confiscation is clearly established. *State ex rel. Associated Natural Gas Company*, 706 S.W.2d at 881.

In the case at bar the Commission found that USW had a rate base of $1,601,-987. The Commission adopted a consolidated capital structure consisting of 22.87% common equity and 77.13% long-term debt. The Commission imputed a reasonable debt cost of 12.26% and determined 12.9% to be an appropriate return on equity. This results in an overall weighted cost of capital of 12.41%. Thus, the Commission allowed in cost of service an amount for interest payments of $151,486 and a total return on capital of $198,807.

USW argues that the Commission's decision threatens their financial integrity because the true debt service is $263,000 per year. However, this debt service includes principal and interest and as even USW's accountant volunteered, "[t]he principal reductions are quite high under this loan agreement."

In addition to rate base, the consolidated companies have $361,288 in notes receivable from their shareholder, Charles Schleicher, for which the companies have not received any interest or payment. If this shareholder debt had been charged the minimum interest rate charged by Nichols, before the refinancing, the note would have accounted for an additional $112,580 in income from January 22, 1985 through July 31, 1988.[1] At the rate proposed for refinancing of 14.25%, the annual interest foregone on this debt is $51,484. The Commission found that the removal of debt service on the shareholder note would decrease the

debt service obligations by approximately $67,000.

Both the Commission Staff and USW witnesses testified that depreciation expense and deferred taxes can be used for payments on principal. The amount for depreciation included in USW's rates is $39,422 and for deferred income taxes the amount is $19,225. The Commission found that the shareholder's portion of the debt service combined with the non-cash expense such as depreciation and deferred taxes, plus cash presently available and the increase approved by the Commission, were more than sufficient to meet the company's debt service obligations.

USW has not met its burden of showing the rate allowed by the Commission to be confiscatory.

The judgment herein is affirmed.

All concur.

---

**1.** This is the period for which the notes from    Schleicher had been outstanding.