**STATE ex rel. ASSOCIATED NATURAL GAS COMPANY, Relator-Appellant,**

v.

**PUBLIC SERVICE COMMISSION OF MISSOURI, Respondent,**

and

**Office of the Public Counsel of the State of Missouri, Intervenor-Respondent.**

No. WD 36576.

Missouri Court of Appeals, Western District.

Dec. 31, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied March 4, 1986.

Application to Transfer Denied April 15, 1986.

Charles G. Siebert, August L. Griese-dieck, Ann E. Buckley, Schlafly, Griese-diech, Toft & Virtel, St. Louis, for relator-appellant Associated Natural Gas Co.

Martin C. Rothfelder, Asst. Gen. Counsel, Missouri Public Service Com'n, Jefferson City, for respondent.

Richard W. French, First Asst. Public Counsel, Jefferson City, for intervenor-respondent Office of the Public Counsel.

Before MANFORD, P.J., and PRITCHARD and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

In December, 1982, the appellant Associated Natural Gas Company (Company), a public utility, applied with the Missouri Public Service Commission (Commission) for a rate increase for gas service provided in its Missouri service area. After hearing, the Commission issued an order permitting a rate increase which would generate gross revenues in an amount substantially less than that requested by the appellant. At the heart of this appeal is the issue whether in the ratemaking process the Commission can consider the financial structure of a corporate parent in determining the service rates of the subsidiary, a Missouri utility. This court considers the validity of the use of this concept, known as "double leveraging," for the first time. Its use by the commission under the facts of this case is strenuously attacked by the utility company.

The Company, whose home office is in Blytheville, Arkansas, is a wholly owned subsidiary of Arkansas Power and Light (APL), an electric utility doing business and regulated in Missouri. In turn, all of APL's common stock is owned by Middle South Utilities (MSU), a public utility holding company. MSU's common stock is market traded whereas the Company's and APL's is not.

The Company supplies natural gas to a total of about 45,000 customers in southeast Missouri and in the Butler and Kirksville areas. The Company applied for increases in residential rates to raise gross revenues by $1,857,323. The Commission authorized tariffs which increased gross revenues by $437,111. The circuit court affirmed the Commission.

In substance, the Company contends the Commission's use of "double leveraging" lowered the rate increase below what was just and reasonable. The Commission consolidated the capital structure of the Company and APL and MSU to arrive at a rate increase it deemed fair and permissible. Stripped of all the jargon, the Company asserts that only its financial figures should have been used in the rate determination and that the Commission's formula lowered the return to the company by 15%, resulting "in a loss of about $1,100,000."

An essential function of the Commission in the ratemaking process is to determine an appropriate rate of return. Typically, the rate of return is designed to provide sufficient revenue to cover the utility's total cost of service. Such costs include both the operating expenses of the utility and an adequate "return" on the investment in property and equipment serving the public. *Central Maine Power Co. v. Public Utilities Commission*, 455 A.2d 34, 38 (Me. 1983).

Two leading United States Supreme Court decisions are instructive in arriving at what constitutes a just and reasonable rate:

A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.

*Bluefield Water Works & Improvement Co. v. Public Service Commission*, 262 U.S. 679, 692–93, 43 S.Ct. 675, 678–79, 67 L.Ed. 1176 (1923).

[T]he Commission [is] not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of "pragmatic adjustments." And when the Commission's order is challenged in the courts, the question is whether that order "viewed in its entirety" meets the requirements of the Act. Under the statutory standard of "just and reasonable" it is the result reached not the method employed which is controlling. It is not theory but the impact of the rate order which counts. *If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end.* The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.

The rate-making process under the Act, i.e., the fixing of "just and reasonable" rates, involves a balancing of the investor and the consumer interests.... It is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise.

*Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 602–03, 64 S.Ct. 281, 287–88, 88 L.Ed. 333 (1944) (citations omitted) (emphasis added).

In other words, the ratemaking function must provide sufficient income to cover the utility's operating expenses and debt service. *United States v. Federal Communications Commission*, 707 F.2d 610, 612 (D.C.Cir.1983). In addition, there must be enough revenue generated as a return to the owners of the company's stock to assure confidence in the continued financial services of the business and to attract equity investors. *Hope Natural Gas, supra*, 320 U.S. at 603, 64 S.Ct. at 288. The rate of return should not be higher than is necessary to achieve these goals. Otherwise, utility customers will pay excessive prices, something regulation seeks to prohibit. *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 791–92, 88 S.Ct. 1344, 1372–73, 20 L.Ed.2d 312 (1968).

As is applicable here, the ratemaking process requires the regulatory body to determine the utility's cost of capital (debt and equity costs). These calculations result in a percentage figure which is then

multiplied by the value of assets used in production of the utility service to ultimately arrive at a rate charge that will not be burdensome to the customer and at the same time will be just and reasonable to the Company.

The Company raises numerous points and subpoints on appeal whereby it contends that the trial court erred in affirming the Commission's report and order: 1) the Company primarily complains of the Commission's use of the double leverage methodology under the facts in this case in arriving at a rate of return; 2) the Commission erred in using the figures of independent, unregulated, out-state utilities which provide a different product; 3) the effect of the order was confiscatory and violative of due process; and 4) the Commission erred in following the testimony of the staff witness.

The proceedings and order of the Missouri Public Service Commission are administrative by nature. Appellate review of such orders and proceedings is governed by Mo.Const. art. V, § 18: "[S]uch review shall include the determination whether the same are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence on the whole record."

■ On appeal, this court's role is to determine whether the Commission's report and order was lawful and reasonable. *State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission*, 585 S.W.2d 41, 47 (Mo. banc 1979). The lawfulness of a Public Service Commission order depends on whether it issued under statutory authority. *State ex rel. Gulf Transport Co. v. Public Service Commission*, 658 S.W.2d 448, 452 (Mo.App. 1983). In determining the statutory authorization for or lawfulness of the order, the court need not defer to the Commission. *State ex rel. Utility Consumer's Council of Missouri, supra*, 585 S.W.2d at 47. However, as to matters of reasonableness,

the court cannot substitute its judgment for that of the Commission if it is supported by substantial and competent evidence on the record as a whole. *Id.*

■ Since the reviewing court is not authorized to weigh the evidence heard by the Commission, the Commission's findings are prima facie correct. In ·other words, the order is presumed valid. *State ex rel. Ashcroft v. Public Service Commission*, 674 S.W.2d 660, 662 (Mo.App.1984). The burden is on the party attacking the validity of the Commission's order. *State ex rel. Utility Consumer's Council of Missouri, supra*, 585 S.W.2d at 47. Under § 386.430, RSMo 1978 (all statutory references are to RSMo 1978 unless otherwise indicated), the Company as the challenger carries the burden of showing by "clear and satisfactory evidence" that the order or decision is unlawful or unreasonable. The Commission's action warrants reversal only if it appears arbitrary, capricious, and without reasonable basis. *State ex rel. Missouri Power and Light Co. v. Public Service Commission*, 669 S.W.2d 941, 944 (Mo.App.1984).

Although ratemaking guidelines appear simple, the actual implementation of ratemaking employs complicated and sophisticated theories accompanied by few givens and many variables. The transcript and exhibits in this case are extensive. The Company and the Commission have done little to explain the expert testimony and exhibits. Jargon and terms commonly used by economists in this area have little or no meaning to persons lacking expertise in the methodology of utility finance. Counsel are urged in these cases to make some effort to explain in their briefs and to make an understandable record of what "double leverage" and similar terms are and what they mean. Otherwise, court review is reduced initially to a project analogous to translating and deciphering the Rosetta Stone. As stated by the court in *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 459 A.2d 1381 (R.I.1983), the "terminology and the testimony of expert witnesses ... achieve

flights of rare sophistication into the arcane and the incomprehensible." *Id.* at 1386.

For the benefit of the reader, the court now sets out a glossary of financial terms related to the "double leverage" concept:

1. Cost of Capital—amount a utility must pay to secure financing from debt and equity (stock) investors; cost of capital is essentially the equivalent of fair rate of return.

Calcuation of cost of capital entails three steps:

(a) determine the cost of different components of capital, i.e. debt and equity

(b) determine weighted cost for each item—multiply cost of item by its ratio to total capital

(c) add weighted costs—sum equals rate of return

*New England Telephone and Telegraph Co. v. Public Utilities Commission,* 390 A.2d 8, 32 (Me.1978).

Example:

| Item | Capital Structure | | Cost | | Weighted Cost |
|------|-------------------|---|------|---|---------------|
| Debt | 40% | × | 8% | = | 3.2% |
| Equity | 60% | × | 12% | = | 7.2% |
| | | | Rate of Return = | | 10.4% |

2. Cost of Equity Stock Using Discounted Cash Flow (DCF) Model—dividend yield plus expected growth in value of equity investors' investment, *i.e.,* yield + growth = bare cost of equity. *General Telephone Company of the Midwest v. Iowa State Commerce Commission,* 275 N.W.2d 364, 369 (Iowa 1979); *New England Telephone and Telegraph, supra,* 390 A.2d at 36.

Example:

| Dividend Yield | + | Growth | = | Bare Cost of Equity |
|----------------|---|--------|---|---------------------|
| 8.5% | + | 1.25% | = | 9.75% |

3. Rate of Return—cost of capital. (See #1 *supra*). Rate of return may be expressed as the return a utility earns on its investment in property serving the public. *New England Telephone and Telegraph, supra,* 390 A.2d at 30.

4. Fair Rate of Return—a rate of return that "covers utility operating expenses, debt service, and dividends, if it compensates investors for the risks of investment, and if it is sufficient to attract capital and assure confidence in the enterprise's financial integrity." *Massachusetts Electric Co. v. Department of Public Utilities,* 381 N.E.2d 325, 328 (Mass.1978). This return should be roughly equivalent to the return offered by similarly situated businesses in the same industry. *General Telephone Company of the Midwest, supra,* 275 N.W.2d at 368.

5. Rate Base—utility property that provides the service for which rates are charged, *i.e.,* total property investment used and useful at the time of the rate commission inquiry. *United Telephone Company of Iowa v. Iowa State Commerce Commission,* 257 N.W.2d 466, 468 (Iowa 1977); *New England Telephone and Telegraph, supra,* 390 A.2d at 14.

6. Ratemaking Equation—rate base × rate of return = profit. *General Telephone Company of the Midwest, supra,* 275 N.W.2d at 370.

Since the propriety of double leveraging in this case is one of first impression in Missouri, it may also be useful to explain what double leveraging is and what it accomplishes. Corporations typically are financed with both debt (borrowed money) and equity capital (proceeds from stock offerings). "Leveraging" is a financial term used to describe the situation in which a corporation is funded by debt in addition to the equity supplied by stockholders. *Arkansas Public Service Commission v. Lincoln-Desha Telephone Co.*, 609 S.W.2d 20, 22 (Ark.1980); *New England Telephone and Telegraph Co., supra*, 390 A.2d at 40; *General Telephone Company of the Southwest v. Corporation Commission*, 98 N.M. 749, 652 P.2d 1200, 1205 (1982).

A corporation is "leveraged" to the extent that debt is included in its capital structure. The leverage arises from the advantage equity holders gain through the rental of capital at a lower rate than the return they receive on their equity. Leverage allows equity owners to earn an overall rate of return in excess of the cost of capital. The added earnings above the cost of borrowed capital inure to the benefit of the stockholders who receive a higher rate of return than if the corporation had been financed entirely by equity. *Arkansas Public Service Commission, supra*, 609 S.W.2d at 22. Utility regulators prevent these excess earnings by analyzing the utility's capital structure and allocating a different weighted cost to each of the individual elements of the capital structure, including debt. Therefore, utility owners can earn on debt only what it costs them to secure the leverage. *New England Telephone and Telegraph Co., supra*, 390 A.2d at 41; *General Telephone Company of the Southwest, supra*, 652 P.2d at 1205. In sum, it generally costs less for a corporation to borrow money and pay interest than to issue stock and pay dividends. If the cost of debt is 8% and the cost of equity capital is 10%, to the extent a utility can borrow at 8% and earn a 10% rate of return, it gains excess earnings.

Today, it is becoming more common for a utility to operate as a wholly owned subsidiary of a parent holding company. Double leveraging is an extension of the leveraging concept to a parent-subsidiary corporate relationship. For example, Company A is an operating utility financed partly with debt capital and partly with equity capital. It uses leverage as explained above. However, the common stock of Company A is owned by Company B, the parent company. Company B obtained the funds it invested in the common stock of Company A by raising its own capital through the sale of stock and from a debt issue. Thus Company A enjoys its own leverage factor plus the leverage factor of Company B. This is the essence of the meaning of double leverage. *New England Telephone and Telegraph, supra*, 390 A.2d at 41.

The objective of leveraging or double leveraging is to apply a rate of return on the rate base in proportion to the weighted cost of capital. *New England Telephone & Telegraph Co., supra*, 459 A.2d at 1386. The principle behind the double leverage adjustment is to account for the parent's alleged use of low cost debt to acquire equity in its subsidiary, upon which it may earn a higher rate of return than it pays for the debt. If the cost of capital to the utility is considered without regard to the double leverage enjoyed in a parent-subsidiary relationship, an *excessive return* to the ultimate common *stockholders* could result *at* the *expense of* utility *ratepayers*. *New England Telephone and Telegraph, supra*, 390 A.2d at 41; *General Telephone Company of the Southwest, supra*, 652 P.2d at 1205; *see also Southwestern Bell Telephone Co. v. Arkansas Public Service Commission*, 267 Ark. 550, 593 S.W.2d 434, 444 (1980); *United Telephone Company of Iowa, supra*, 257 N.W.2d at 480. Double leveraging also prevents discrimination against companies not involved in leveraging on a parent-subsidiary basis. *New England Telephone and Telegraph, supra*, 390 A.2d at 42.

The double leverage approach recognizes that a wholly owned subsidiary like the Company does not raise capital in the open

market. In fact, the subsidiary's true cost of equity depends on the parent company's combined cost of capital which is substituted for the subsidiary's cost of equity in computing the utility's rate of return. *Tennessee-American Water Company v. Tennessee Public Service Commission,* No. ——, slip op. at —— (Tenn.Ct.App. Apr. 11, 1985). "The attractiveness of the company as an investment is dependent on how attractive the parent company is as an investment." *General Telephone Company of the Midwest, supra,* 275 N.W.2d at 369.

In applying the double leverage concept in this case, the Commission emphasized that the economic relationships existing between the parent and subsidiary companies made it possible to assign the *cost of parent capital* as the subsidiary's *cost of equity.* In other words the Company is the wholly owned subsidiary of APL and APL is the wholly owned subsidiary of MSU. The common stock of both subsidiaries is not market traded. By contrast, MSU's common stock is market-traded, which means that a more direct and objective measure of its cost may be obtained. Guided by this rationale, the Commission assigned APL's *cost of capital* to the Company's *cost of equity.*

The Company wanted only its capital structure used in determining the increase. It asked for rates sufficient to earn a 16.5% return on equity, which would result in a 12.76% return on the rate base. The Commission's order, which applied double leveraging and was approved by the trial court, authorized a 14% return on the Company's equity, which computed to between an 11.17% and 11.66% return on its rate base. In doing so, the Commission approved a 15.15% return on equity for APL and MSU. The Commission made no adjustments between APL & MSU for return on equity because MSU's borrowed capital amounted to only 2.7% of its total capital structure. Thus, for purposes of determining the Company's rate of return, APL & MSU's return on equity were considered as the same. The Appendix to the opinion generally shows where the final figures came from. The Commission said the 14% figure for the Company was a fair rate of return and the 15.15% return on equity for MSU compared favorably with that of other electric utilities.

Several courts have approved the concept and application of "double leverage" in the ratemaking process. *See Southwestern Bell Telephone Company v. Arkansas Public Service Commission,* 593 S.W.2d 434 (Ark.1980); *United Telephone Company of Iowa v. Iowa State Commerce Commission,* 257 N.W.2d 466 (Iowa 1977); *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 448 A.2d 272 (Me.1982); *Mountain States Telephone and Telegraph Co. v. Department of Public Service Regulation,* 624 P.2d 481 (Mont.1981); *General Telephone Company of the Southwest v. Corporation Commission,* 98 N.M. 749, 652 P.2d 1200 (1982); *Bristol County Water Co. v. Harsch,* 120 R.I. 223, 386 A.2d 1103 (1978); *General Telephone Company of the Southeast v. Public Service Commission of the State of Tennessee,* No. 84–321–II, slip op. at —— (Tenn.Ct.App. Feb. 6, 1985). *General Telephone Company of the Southwest v. Public Utility Commission of Texas,* 628 S.W.2d 832 (Tex.Ct.App.1982).

The Company alleges the funds APL used to purchase the Company's stock must be traced. It objects to the Commission's imposition of a hypothetical structure upon the Company through double leveraging. In fact, the Company itself has no quarrel with the use of double leveraging by regulatory bodies, for in its reply brief the Company states: "Associated does not contend that double leverage may not be used in a lawful manner on some given fact situations, but simply that such facts are not present in this case." This position is somewhat at odds with the Company's negative stance in its main brief. The crux of the Company's argument is that the Commission should not have used double leveraging in this case because APL did not borrow any money to acquire the company's stock. APL acquired its interest in the Company in a stock for stock exchange. According to the Company,

double leveraging is permissible only in situations in which a parent corporation issues unrestricted debt, the proceeds of which are used to invest in the stock of its subsidiary.

The Commission based the use of double leveraging on the testimony of staff witness Kemp. The Company further complains that staff witness Kemp based his testimony on theoretical assumptions. Kemp recognized that as a practical matter APL did not use debt proceeds to purchase the Company's stock. However, he testified that double leveraging is appropriate here because all sources of APL's available capital could theoretically be used to finance the investment in the subsidiary company. Because APL acquired equity ownership of the Company in a stock for stock transaction, the Company contends that its acquisition cannot be traced to a debt issue by APL, and therefore double leveraging in this case is inapplicable.

Though this court can point to no cases in which a regulatory body applied double leveraging in a stock for stock exchange context, there are several cases which lead the court to reject the Company's argument. *General Telephone Company of the Southwest, supra,* states the double leverage approach *"assumes* the parent corporation finances its subsidiary's equity capital in proportion to its own debt and equity and imputes that levered cost of equity as the cost of equity to the subsidiary."* 628 S.W.2d at 838 (emphasis added). The rationale behind the *assumption* is that it is impossible to trace all investment dollars contributed by the parent to the subsidiary. *Id.* at 843. This is so even though the particular acquisition of the subsidiary might involve a *stock transaction* because "the actual company is financed as a total entity and, therefore, the double leverage will still apply." *Id.*

Though the opinion in *New England Telephone and Telegraph v. Public Utility Commission,* 459 A.2d 1381 (R.I.1983), does not elaborate on the facts in that case, it does suggest that AT & T, the parent, used its shares of stock to purchase the remaining outstanding interest in its subsidiary, New England Telephone (NET). *Id.* at 1387. The court found that fact irrelevant with respect to double leveraging since the Commission's order provided a reasonable rate of return to be applied to the common stockholders of AT & T, who were the equity owners in NET. *Id.* at 1386–87.

What the Missouri Commission has in effect done is to adopt a hypothetical capital structure for ratemaking purposes without regard to the manner in which APL acquired equity ownership of the Company. It appears to be an accepted regulatory practice to disregard the actual book capital structure of a utility when it is deemed to be in the public interest to do so. *New England Telephone and Telegraph, supra,* 390 A.2d at 39. There are two circumstances in which a utility commission might disregard a utility's actual capital structure and adopt a hypothetical capital structure for ratemaking purposes.

The first occurs when the utility's actual debt-equity ratio is deemed inefficient and unreasonable because it contains too much equity and not enough debt, necessitating an inflated rate of return. *Id.* This situation existed in *Communications Satellite Corp. v. Federal Communications Commission,* 611 F.2d 883 (D.C.Cir.1977) (COMSAT), in which the company was 100% equity financed. The Commission there imputed a 45% debt ratio which was admittedly a hypothetical construct. *Id.* at 898, 902. In approving the Commission's action, the United States Court of Appeals for the District of Columbia stated that the "authority of a public utility commission ... to assume hypothetical debt for a company derives from its jurisdiction over rates charged by the company, that they be 'just and reasonable.'" *Id.* at 903.

The second circumstance that justifies adopting a hypothetical construct occurs when the utility is part of a holding company system. In such situations, the utility's book capital structure and capital costs may not be a true reflection of the system's capital costs with respect to a partic-

ular operating company. Double leveraging represents one approach utilized by regulatory agencies to account for a utility's status as a subsidiary in a holding company system. *New England Telephone and Telegraph, supra,* 390 A.2d at 39. Moreover, it is only the parent's *alleged* use of its low cost debt to purchase stock in its subsidiary that serves as the principle behind the application of double leveraging. *Id.* at 41.

The case cited by the Company in support of its proposition that double leveraging by its own terms requires that a parent use debt issue proceeds to acquire equity in its subsidiary states: "The principle behind the double leverage adjustment is to account for the parent's *accessibility* to lower cost debt to purchase equity in its subsidiary, upon which it may earn a higher rate of return than it pays for the debt." *General Telephone Company of the Southwest, supra,* 652 P.2d at 1205 (emphasis added). Actually, the *General Telephone* court cites to the *New England Telephone and Telegraph* case, which refers to the "alleged" use of debt, for the quoted statement. *See New England Telephone and Telegraph, supra,* 390 A.2d at 41. Neither case states that application of double leverage mandates that a parent use debt proceeds to purchase the equity in a subsidiary.

The Commission's assumption that *all* sources of capital available to APL could theoretically be used to finance the investment in the company squares with the principle behind double leveraging. This assumption renders a stock for stock exchange irrelevant. The Commission's action is analogous to the COMSAT case, *supra,* where the Commission imputed hypothetical debt financing even though the company was 100 percent equity financed. In the present case, the Commission imputed hypothetical debt and equity financing (leveraging) by APL even though APL's investment in the Company was the result of a stock for stock exchange.

Perhaps the ultimate authority for imputing debt and equity financing when necessary to protect ratepayers from excessive charges is the Supreme Court's statement in *Hope Natural Gas:* "The rate-making process under the Act, *i.e.,* the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests." *Hope Natural Gas, supra,* 320 U.S. at 603, 64 S.Ct. at 288. The ratepayer should not be placed at an unfair disadvantage simply because APL chose to invest in the Company through a stock for stock exchange rather than through direct debt financing.

■ APL's method of acquiring the Company was determined by the management of the two companies, not by the rate order of the Commission. The record establishes that the Commission applied the double leverage adjustment in order to protect Missouri rate payers from paying excessive gas utility rates. The Commission fulfilled its function when it established a fair and reasonable rate of return by employing double leveraging. *See Mountain States Telephone and Telegraph Co., supra,* 624 P.2d at 486.

■ The Company's argument that the fact that all other costs (income tax expense and cost of debt) were based on consideration of appellant as an independent company warrants independent treatment of the company in calculating its cost of equity is also without merit.

■ In approving the Commission's application of double leverage in this case, the court emphasizes that it is not methodology or theory but the impact of the rate order which counts in determining whether rates are just, reasonable, lawful, and non-discriminating. *Southwestern Bell Telephone Co., supra,* 593 S.W.2d at 445; *New England Telephone and Telegraph, supra,* 390 A.2d at 32. In the words of the Supreme Court: "If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry ... is at an end." *Hope Natural Gas, supra,* 320 U.S. at 602, 64 S.Ct. at 288.

■ Section 393.150, RSMo Supp.1985, authorizes the Commission to fix gas rates

**880**

after a formal hearing. The statute neither prescribes nor limits the methodology that the Commission may use in determining rates. The complexities inherent in a rate of return determination necessarily require that the Commission be granted considerable discretion. *United Telephone Company of Iowa, supra,* 257 N.W.2d at 480.

Because ratemaking is not an exact science, the utilization of different formulas is sometimes necessary. *United States v. Federal Communications Commission,* 707 F.2d 610, 618 (D.C.Cir.1983). For this reason, the fact that the Missouri Commission has never before applied double leveraging in determining rates for the Company is of no consequence. The Supreme Court of Arkansas, in dealing with this issue, stated that there is no "judicial mandate requiring the Commission to take the same approach to every rate application, or even to consecutive applications by the same utility, when the commission, in its expertise, determines that its previous methods are unsound or inappropriate to the particular application." *Southwestern Bell Telephone Co., supra,* 593 S.W.2d at 445.

■ Not only can the Commission select its methodology in determining rates and make pragmatic adjustments called for by particular circumstances, but it also may adopt or reject any or all of any witnesses' testimony. *In re Permian Basin Area Rate Cases, supra,* 390 U.S. at 800, 88 S.Ct. at 1377. Evaluation of expert testimony was for the Commission. *Southwestern Bell Telephone Co., supra,* 593 S.W.2d at 445–46. The testimony and exhibits incorporated into the record provide a sufficient foundation for the Commission's application of double leverage in the Company's case. The rate of return on equity of 14% was based upon competent and substantial evidence on the whole record. The result reached by the Commission was reasonable and lawful, and as stated in *Hope Natural Gas, supra,* judicial inquiry is at an end.

## II.

The Company's second point alleges a violation of equal protection and due process because the Commission was not statutorily authorized to consider MSU's cost of equity in the Company's rate hearing. The Company sets out several factors to bolster this proposition: (a) MSU is not regulated in Missouri; (b) MSU is an electric supplier, not a gas supplier; (c) MSU is totally separate from the Company; (d) All other costs of the Company used in setting the rates were based on consideration of the Company as an independent entity, with the exception that the Commission used MSU's cost of equity in determining the Company's cost of equity; and (e) Sections 393.140(12) and 393.230(3) and (4), RSMo.Supp.1985, prohibit the consideration of unregulated activities of a company, and therefore the order went beyond the law.

■ This argument and the proposed statutory interpretation are without citation of authority and not well taken. None of the cases mentioned in Part I contain any language that precludes the application of double leveraging because the parent is from out-of-state or is not in business to supply the exact same service as the applicant. In fact, the jurisdictional argument as presented here was specifically rejected in *General Telephone Company of the Southwest, supra,* 628 S.W.2d at 836–38. Section 393.140(12), which does prohibit regulation of "any other business" of the utility "not otherwise subject to the jurisdiction of the commission," also states that it shall not restrict the Commission's "right to inquire as to, and prescribe the apportionment of, capitalization, earnings, debts and expenses fairly and justly to be ... borne by" the utility in question.

■ Again, without citation of authority, the Company argues the underscored language of section 393.270(4) prohibits the consideration of finances of any company other than the applicant for a rate increase:

4. In determining the price to be charged for gas, electricity, or water the commission may consider all facts which

in its judgment have any bearing upon a proper determination of the question although not set forth in the complaint and not within the allegations contained therein, with due regard, among other things, to a reasonable average return upon capital actually expended and to the necessity of making reservations out of income for surplus and contingencies. This argument fails to give any credence to the language that says "due regard" should be given to capital actually expended and to the language that says the Commission may "consider all facts" in its judgment that bear upon the question of price. In any event, what the Company cannot counter is that it is a wholly owned subsidiary which means the equity owner(s) are APL and ultimately MSU.

■ As stated earlier, *Hope Natural Gas, supra,* 320 U.S. at 603, 64 S.Ct. at 288, makes it clear consideration must be given to the actual equity owner in the ratemaking process. *Hope Natural Gas* specifically approves the Commission's consideration of the return to the "investor" or "equity owner." The use of a cost-of-capital approach as to the ultimate shareholder seems totally consistent with that language. *See* Copeland, *Double Leverage One More Time,* 105 Pub.Util.Fort. 19 (1977). The conscious and voluntary corporate business decision that resulted in the hierarchy as exists here should not and cannot shield pertinent financial data from the Commission's scrutiny just because the ultimate owner does not provide the same service as the applicant and is not regulated. Also, once the utility asks for higher rates, a commission may inquire into the utility's capital structure and apply a hypothetical construct. *Cf. Northwestern Bell Telephone Co. v. Iowa State Commerce Commission,* 359 N.W.2d 491, 497 (Iowa 1984). This capital structure was determined by the management of the companies, not by the rate order of the Commission. *See Mountain States Telephone and Telegraph, supra,* 624 P.2d at 486. Despite the Company's contention that it is operationally and financially independent from APL or MSU, it is hard to believe a

wholly owned subsidiary could be as autonomous as is here claimed. Application of the double leverage method to determine a fair rate of return has not deprived the company of due process or equal protection of the law. *General Telephone Company of the Southwest, supra,* 652 P.2d at 1206.

### III.

■ The Company next complains that substituting APL's weighted cost of capital for the Company's cost of contributed equity reduced the Company's return on equity to the extent it was confiscatory. It argues the Commission's adoption of a 14% return on equity for the Company reduces the "financial value of Associated's investment in Missouri rate base by up to 15% ... and deprives its investor of their [sic] property ... without due process of law in violation" of the U.S.Const. amend. XIV and Mo.Const. art. I, § 10. The Company does not address the issue of the stockholder's (APL) right to a fair and reasonable return on its investment. *See State ex rel. Missouri Water Co. v. Public Service Commission,* 308 S.W.2d 704, 718 (Mo. 1957); *State ex rel. Missouri Public Service Commission v. Fraas,* 627 S.W.2d 882, 886 (Mo.App.1981).

As stated previously, the discretion accorded the Commission in ratemaking limits judicial review. The method for determining rates are for the Commission, and on this point the court is concerned only if constitutional limitations are transgressed. As to whether the resultant rate is confiscatory, the utility has the burden of proof. The Commission's order will not be set aside unless confiscation is clearly established. *St. Joseph Stock Yards Co. v. United States,* 298 U.S. 38, 53, 56 S.Ct. 720, 726, 80 L.Ed. 1033 (1936); *Los Angeles Gas & Electric Corp. v. Railroad Commission,* 289 U.S. 287, 304–05, 53 S.Ct. 637, 643–44, 77 L.Ed. 1180 (1933). If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry is precluded. That the method employed to reach the result may contain infirmities is

not important. *Hope Natural Gas, supra,* 320 U.S. at 602–03, 64 S.Ct. at 287–88.

When the Company talks of the harm to its investor (here it refers to APL) and the confiscatory effect of the Commission's order, it bolsters the use of double leveraging and consideration of the parent's cost of capital in determining the utility's needs. The utility on one hand cannot ask to be treated as a stand alone entity and on the other hand argue its sole stockholder and ultimate parent must be given consideration in the setting of the Company's rates. As previously stated, the corporate structure and ownership here has been created willingly in a business enterprise. "Double leverage methodology recognizes the financing of equity for a subsidiary ... [results] from boardroom decisions made by a parent corporation which controls, to a great extent, the ultimate cost of a subsidiary's equity." *General Telephone Company of the Southwest, supra,* 628 S.W.2d at 838.

Also without merit is the Company's argument that the low rate of return incurred through the use of double leveraging will deter a potential purchaser from buying the Company. As a sidelight to this action, the court notes in 1971 the Securities and Exchange Commission (SEC) ordered MSU to divest its gas properties. Since that time, MSU has accepted no offers, and the Commission found no offers imminent even before this action and the use of the double leverage adjustment. In the order under review, the Commission correctly found the SEC order irrelevant because the rates would have to be adjusted and re-figured depending on the status of the new owner.

The Company's confiscation argument is unsupported by evidence and is merely a recitation of the Company's conclusion. *See Beaumont, S.L. & W. Ry. v. United States,* 282 U.S. 74, 88–89, 51 S.Ct. 1, 6–7, 75 L.Ed. 221 (1930). Other than abstractly concluding the 14% rate of return is confiscatory, the Company has not come close to carrying the burden of showing the rate fell outside the "zone of reasonableness."

*In re Permian Basin Area Rate Cases, supra,* 390 U.S. at 767, 88 S.Ct. at 1360. As such, the Company has not supplied sufficient proof of the confiscatory effect of the Commission's order. *Fraas, supra,* 627 S.W.2d at 886; *General Telephone Company of the Southeast, supra.* There is no basis in the record for this court to hold that the Commission's order results in a confiscation, *New England Telephone & Telegraph Company, supra,* 448 A.2d at 291, or that no new purchasers of the utility's common stock will come forward. The Commission merely attempts to preclude the investor from earning an excessive return at the expense of Missouri ratepayers. *Mountain States Telephone and Telegraph, supra,* 624 P.2d at 483. Because it failed to show under *Hope Natural Gas, supra,* that the rate order was unreasonable, the Company has not met its burden to warrant a reversal.

## IV.

In its last point the Company argues the Commission should have accepted the testimony of its witness, Mr. Turner, as opposed to that of the staff witness, Mr. Kemp. The Company says its witness gave the only "competent testimony" on cost of equity. The innuendo is that witness Kemp was not competent. This argument has not been preserved nor is it meritorious. The Commission as the trier of fact was free to choose between conflicting testimony. *General Telephone and Telegraph Company, supra,* 390 A.2d at 36. The Commission accepted the testimony of Kemp, who was qualified as an expert. It was not error to do so.

The judgment is affirmed.

## APPENDIX

The Commission first had to determine APL's cost of capital. APL's capital structure consisted of three components: common equity, preferred stock, and long-term debt. Long term debt accounted for 57.23 percent of APL's capitalization. Preferred stock accounted for 13.04 percent and common equity accounted for 29.73 percent of

capitalization. The Commission determined the cost of long term debt to be 10.43 percent and the cost of preferred stock to be 9.36 percent. These costs were derived solely from the recorded capital structure of APL.

As to APL's cost of equity, the Commission established that figure to be the same as MSU's. The Commission developed a cost of equity for MSU by using a variation of the discounted cash flow (DCF) model and adjusting the DCF result for flotation costs. The computations resulted in a 14.-53 percent to 15.77 percent range of return on equity for MSU, with 15.15 percent being the midpoint. The Commission then plugged these figures into APL's cost of equity to arrive at APL's weighted cost of capital which ranged from 11.51 percent to 11.88 percent. Commission staff witness Kemp explained that he made no adjustments in APL's return on equity for the double leverage that existed between MSU and APL because the adjustments would have been insignificant given MSU's low debt ratio of 2.7 percent.

Using the 15.15 percent figure, the midpoint of MSU's cost of equity, the Commission calculated APL's weighted cost of capital (rate of return) to be 11.69 percent:

| % of Total Capital | | | Cost | | Weighted Cost of Capital |
|---|---|---|---|---|---|
| Common Equity | 29.73% | × | 15.15% | (MSU's Cost of equity)  = | 4.50% |
| Preferred Stock | 13.04% | × | 9.36% | = | 1.22% |
| Long Term Debt | 57.23% | × | 10.43% | = | 5.97% |
| | | Rate of Return | | = | 11.69% |

At this point, the Commission employed the double leverage concept. The next step was to determine the Company's capital structure, which consisted of two components: long term debt and common equity. The Company's capitalization computed to a debt ratio of 47.95 percent and an equity ratio of 52.05 percent. The Company's cost of long term debt was 8.62 percent.

The Commission next categorized the common equity component as contributed equity and retained earnings. These items computed to a contributed equity ratio of 18.30 percent and a retained earnings ratio of 33.75 percent, totalling a common equity ratio of 52.02 percent. The following table simplifies the Company's capital structure:

| Component | % of Total Capital |
|---|---|
| Long Term Debt | 47.95% |
| Common Equity | |
| (1) Contributed Equity | 18.30% |
| (2) Retained Earnings | 33.75% |
| | 100.00% |

The Commission applied double leveraging in two respects to arrive at a rate of return for the Company. First, it assigned APL's *weighted cost of capital* (11.69%) as the Company's *cost of contributed equity*. Second, it assigned APL's *cost of equity* (15.15%), which equates with MSU's cost of equity, as the Company's *cost of retained earnings.*

The following table illustrates and hopefully simplifies the Commission's application of double leverage. The Company is identified as "Associated":

| Component | Capital Ratio | | Associated's Cost | APL's Cost | | Associated's Weighted Cost of Capital |
|---|---|---|---|---|---|---|
| Long Term Debt | 47.95% | × | 8.62% | | = | 4.13% |
| Contributed Equity* | 18.30% | × | | 11.69%** | = | 2.13% |
| Retained Earnings | 33.75% | × | | 15.15%*** | = | 5.11% |
| Totals | 100.00% | | Rate of Return | | = | 11.37% |

\* Associated's <u>cost of contributed equity</u> equates with APL's <u>Cost of capital</u> (11.69%). The calculations are broken down as follows:

| | Capital Ratio | | | APL's Cost | | Associated's Weighted Cost |
|---|---|---|---|---|---|---|
| | | APL–Associated | | | | |
| APL Long Term Debt | 57.23% | 10.47% (1) * | × | 10.43% | = | 1.09 |
| APL Preferred Stock | 13.04% | 2.39% (2) * | × | 9.36% | = | .22 |
| APL Common Equity | 29.73% | 5.44% (3) * | × | 15.15% | = | .82 |
| Totals | 100.00% | 18.30% | Rate of Return | | = | 2.13 |

(1)\* 57.23% (APL) × 18.30% (Associated Contributed Equity) = 10.47%
(2)\* 13.04% (APL) × 18.30% (Associated Contributed Equity) = 2.39%
(3)\* 29.73% (APL) × 18.30% (Associated Contributed Equity) = 5.44%

\*\* 11.69% represents APL's weighted cost of capital.
\*\*\* 15.15% represents APL's (and necessarily MSU's) cost of equity.