STATE, ex rel., SURE–WAY TRANSPOR-TATION, Oliver Motor Service, Inc., Fleming–Babcock, Inc., Leroy H. Bisg-es, Inc., Leeser Transportation, Inc., Appellants,

v.

DIVISION OF TRANSPORTATION OF the STATE OF MISSOURI, Respondent,

and

Joe Ruhl, et al., Intervenors.

No. WD 41584.

Missouri Court of Appeals, Western District.

Sept. 19, 1989.

James C. Swearengen, Jefferson City, for appellants.

Carla Grace Holste, Jefferson City, for respondent.

Richard S. Brownlee, III, Jefferson City, for intervenor Limestone Producers Ass'n, et al.

Earl Richard Southern, Jefferson City, for intervenor Mo. Dump Truckers Ass'n, et al.

Before CLARK, P.J., and
LOWENSTEIN and BERREY, JJ.

BERREY, Judge.

This appeal is from an order of the circuit court affirming a report and order issued by respondent, Missouri Division of Transportation (DOT), purporting to cancel a tariff filed by appellant and other named motor carriers.

Appellant presents two points on appeal: (1) that the circuit court erred in affirming the DOT's report and order as the tariff became effective January 16, 1987, or May 15, 1987, and DOT was without statutory authority to cancel it on September 24, 1987; and (2) that the circuit court erred in affirming DOT's report and order as the report and order is unlawful, unreasonable, and unsupported by substantial and competent evidence upon the whole record as well as being arbitrary and capricious.

Tariff 2100 Div.O.T.Mo. No. 42 (Tariff 2100) was filed on December 15, 1986, with DOT by Sure–Way Transportation, Inc., Oliver Motor Service, Inc., Fleming–Babcock, Inc., Leroy H. Bisges, Inc., Leeser Transportation, Inc. (Appellants) and seven other motor carriers [1] authorized to transport commodities in bulk in dump trucks. Tariff 2100 was designed to eliminate the minimum distance rates and certain other minimum rates and revenue provisions as published in DOT's prescribed master tariff. The existing DOT dump truck rate structure at the time Tariff 2100 was filed provided for both minimum and maximum rates. These rates were applicable to *all* motor common carriers of commodities in bulk in dump trucks pursuant to § 390.121, RSMo 1986 and § 390.041, RSMo 1986.

Tariff 2100's proposed effective date was January 16, 1987. In its order of January 15, 1987, DOT suspended the proposed tariff. DOT docketed the matter as Case No.

---

1. J. Paul Hunt, E. Allan Hunt and J. E. Hunt, d/b/a Hunt Concrete Company; Bross Trucking, Inc.; Frank Formento; Hunt Concrete Company, Inc.; Robert L. Sargent, d/b/a S & S Trucking; Taylor Concrete and Trucking, Inc.; Twehous Excavating Company, Inc.

TT–86–336 and established a schedule of proceedings. Applications to intervene in the case were filed by Joe Ruhl, Randy Potterfield, Missouri Dump Truckers Association, Inc., Missouri Limestone Producers Association and Associated General Contractors (Intervenors). These motions to intervene were granted.

The hearing on the application was held on March 9, 1987. On August 27, 1987, DOT entered an order pursuant to § 390.062.6, RSMo 1986, extending the time in which to enter an order by thirty days. On September 24, 1987, DOT issued its order and report in Case No. TT–86–336, disapproving and cancelling Tariff 2100. Upon review by the circuit court of Cole County, Missouri, the order and judgment of DOT was affirmed. This review followed.

Appellant presents two points on appeal, one of which deals with a procedural question, the other with a substantive question. Testimony presented on the substantive question will be addressed later in this opinion when that issue is reached. The procedural argument presented by appellant concerns the applicable statutory time periods prescribed for proceedings of this nature. Appellant claims that the circuit court erred in affirming DOT's report and order because Tariff 2100 became effective on January 16, 1987, or on May 15, 1987, and DOT was without statutory authority and jurisdiction to cancel it on September 24, 1987.

Missouri statutes provide various methods by which motor carrier rates may be established or changed. The authority of DOT to fix reasonable rates and charges is sanctioned by § 390.121, RSMo 1986.[2] A common carrier may seek to change rates under the provisions of §§ 387.070, RSMo 1986 and 387.200, RSMo 1986 by the "file and suspend" method. Appellants contend that this latter method is the one that they followed in the instant case. "File and suspend" is indeed a proper method for seeking rate changes. *State ex rel. Jackson County v. Public Service Commission*, 532 S.W.2d 20 (Mo. banc 1975).

■ Appellants first argue that the tariff became effective on January 16, 1987, the proposed effective date of the tariff. They argue that the initial action of DOT in suspending Tariff 2100 "until further notice" was a void and unlawful order because § 387.200, RSMo 1986 provides that whenever a schedule is filed with DOT stating a new rate, DOT may suspend the operation of that schedule, but not for a longer period than 120 days. This argument has no merit and ignores the fact that further notice could have been issued within the 120 days and that § 387.200, RSMo 1986 also authorizes a further suspension of up to six months if a hearing cannot be concluded. The statute specifically states, "[I]f any such hearing cannot be concluded within the period of suspension, as above stated, the division may, in its discretion, extend the time period for a further period not exceeding six months." § 387.200, RSMo 1986.

■ Next appellants argue that if January 16, 1987, was not the effective date of the tariff then the tariff became effective on May 15, 1987, at the end of the initial 120 day suspension period. To bolster this argument, appellants again rely on § 387.200, RSMo 1986. They argue that the hearing in this matter was held and concluded on March 9, 1987, well within the initial 120 day suspension period and no action was taken prior to the period's end.

2. **390.121. Rates, fares or charges, changes may be ordered by division of transportation, when.**—Whenever, after hearing, upon complaint or in an investigation on its own motion, the division shall be of the opinion that any individual or joint rate, fare or charge, demanded, charged or collected by any common carrier by motor vehicle or by any common carrier by motor vehicle in conjunction with any common carrier by railroad or express, for transportation; or any classification, rule, regulation or practice whatsoever of such carrier or carriers affecting such rate, fare or charge or the value of the service thereunder, is or will be unjust or unreasonable, unjustly discriminatory, unduly preferential or unduly prejudicial, it shall determine and prescribe the lawful rate, fare or charge or maximum or minimum, or maximum and minimum rates, fares or charges thereafter to be observed, or the lawful classifications, rules, regulations or practices thereafter to be made effective.

The bottom line, according to appellants, is that the tariff stood finally approved as of August 31, 1987, pursuant to § 390.062.5, RSMo 1986.

Section 390.062, RSMo 1986, relates to the procedures for obtaining certificates, permits and rate relief and states in part that, "[t]he division shall issue its final order granting or denying the relief sought in whole or in part within ninety days after the submission of final arguments or else stand approved." § 390.062.5, RSMo 1986. The ninety-day statutory time period expired on August 31, 1987. On August 27, 1987, prior to the expiration of the ninety day time period, DOT issued an order granting itself an extension from August 31, 1987, until on or before September 30, 1987, for the issuance of a final order, designating the tariff as "one of a complex nature," pursuant to § 390.062.6, RSMo 1986. Appellant argues that § 390.062, authorizes such extensions only with respect to applications for certificates and permits and that the tariff herein did not fall within either of the statutory categories.

In response to appellant's argument, respondent relies on *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). The *Permian Basin* cases deal with proceedings by the Federal Power Commission under § 5 of the Natural Gas Act, 15 U.S.C. § 717d(a) to determine maximum just and reasonable rates for the sale of natural gas produced in the Permian Basin. Given the similarity of the statutes construed by the Supreme Court and those at issue in the instant case,[3] a closer examination of the *Permian Basin* cases yields some direction to use as a guide through the statutory maze.

The natural gas producers in *Permian Basin* argued that §§ 4 and 5 must be read together and that the period of effective-

ness of a rate determination under § 5(a) is limited by § 4(e), reasoning that § 4(d) creates an unrestricted right to file rate changes and that § 4(e) would limit the suspension period of such changes for a period of no longer than five months. *Id.* at 779, 88 S.Ct. at 1366. The Supreme Court rejected the argument of the producers, saying:

> If this construction were accepted, it would follow that area proceedings would terminate in rate limitations that could be disregarded by producers five months after their promulgation. The result, as the Commission observed, would be that "the conclusion of one area proceeding would only signal the beginning of the next, and just and reasonable rates for consumers would always be one area proceeding away."

*Id.* (citation ommitted).

If this court adopts the construction urged by appellants a similar result obtains. Appellant's proposed construction would allow for an order of DOT to be overturned unilaterally within a period of 120 days, resulting in a method whereby the filing of a tariff becomes a way to circumvent the lawful exercise of DOT's rate making authority. This in turn would make any efforts on the part of DOT to regulate an exercise in futility.

A closer look at Tariff 2100 reveals that it was indeed in contravention of agency rules. DOT has adopted the following requirements in regard to tariffs:

> (1) Every common carrier, to the extent it is authorized by this division to engage in intrastate transportation of passengers or property between points in Missouri, shall publish and file with the division and keep for public inspection at each of its terminals, tariff schedules

**3.** Section 4(d), 15 U.S.C. § 717c(d), provides that, "[u]nless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public." Tariff 2100 was filed under § 387.070, RSMo 1986, which has as similar provision stating, "Unless the division of transportation otherwise orders, no change shall be made in any rate, fare or charge, or joint rate, fare or charge, which shall have been filed and published by a common carrier in compliance with the requirements of this chapter except after thirty days' notice to the division...." The "file and suspend" provisions of § 387.200, RSMo also mirror those provisions found in § 4(e), 15 U.S.C. § 717c(e).

specifying its rates and charges and which shall— ...

(B) *If filed by common carriers of property, conform to rules contained in 4 CSR 265–6.020 and any such tariff schedule not conforming to the rules may be rejected;*

4 CSR 265–10.050. (Emphasis added).

In the instant case, the tariff filed by appellant was certainly not in conformity with DOT regulations as it sought to abolish the minimum rate lawfully established by DOT. In Case No. T–61, 610, DOT established the minimum/maximum rate structures for the transportation of commodities in bulk in dump trucks. No appeal was taken from DOT's action and thus the order became final. Appellants cannot now cry foul because of their own initial failure to follow agency regulations.

Furthermore, appellant's contentions also fail on a statutory level. Appellant's analysis of § 390.062, RSMo 1986, is not valid. In § 390.062.5 DOT is required to issue its final order "within ninety days after the submission of final arguments." However, § 390.062.6 states that if "the division shall designate an application as one of a complex nature requiring a substantial record," then an additional thirty day extension may be taken by the division. Appellants would limit § 390.062.6 to applications for certificates or permits. This interpretation, however, goes against the logic of the statute. Section 390.062.1 makes reference to applications for certificates under § 390.051, permits under § 390.061, and proceedings while § 390.062.3 and § 390.062.4 use only the word "proceeding." A careful reading of the entire statute shows that the words "proceeding" and "application" are used interchangeably. Indeed, any other interpretation renders the statute ambiguous. Accordingly, the order cancelling Tariff 2100 is affirmed as DOT had the statutory authority and jurisdiction to cancel the tariff on September 24, 1987.

Appellants next contend that the circuit court erred in affirming DOT's report and order as the report and order are unlawful, unreasonable and unsupported by any substantial and competent evidence upon the whole record as well as being both arbitrary and capricious. Appellants also complain that the wrong statutory criteria and burden of proof requirements were applied to the case.

Appellants contend that § 387.200, RSMo 1986, is applicable in the instant case. This statute places the burden of proof on the party seeking a rate increase to prove that the proposed increase is reasonable. Inasmuch as Tariff 2100 is not designed as a rate increase, appellants argue, then the burden of proof is not theirs to carry. Appellants' conclusion, however, is illogical. Chapter 622 of the Missouri Revised Statutes deals with the organization of the Division of Transportation. In particular, § 622.015, RSMo 1986, states that "All powers, duties and functions of the public service commission relating to common carriers generally, chapter 387, RSMo ...are transferred to the transportation division ...and that division is the successor to the public service commission...." Furthermore, the statute instructs that, "Wherever the word 'commission' is used, the word 'division' shall be substituted therefor."

Applying § 622.015, RSMo 1986, to § 386.430, RSMo 1986, which states, "the burden of proof shall be upon the party adverse to such commission or seeking to set aside any determination, requirement, direction or order of said commission," it is clear that appellants bore the burden of proof. This burden is a heavy one. This court in *State ex rel. City of Lake Lotawana v. Public Service Commission*, 732 S.W.2d 191, 195 (Mo.App.1987), acknowledges as much stating, "We go to considerable lengths to give deference to the expertise of the Commission. Furthermore, we acknowledge the restrictive scope of judicial review, which accords to the Commission's orders every presumption of correctness and places a heavy onus upon its challengers to demonstrate its error (citations omitted)." It is also worthy of note that, "the Commission [can] select its methodology in determining rates and make pragmatic adjustments called for by partic-

ular circumstances...." *State ex rel. Associated Natural Gas Company v. Public Service Commission,* 706 S.W.2d 870, 880 (Mo.App.1985). Furthermore, it may also choose to accept or reject any witnesses' testimony or portion of that testimony. *Id.*

■ With these guiding principles in mind, a review of the evidence presented on the subject is in order. Appellants rely on the testimony of their sole witness, Grant M. Davis, Ph.D., "Distinguished" Professor of Business Administration, University of Arkansas. Professor Davis did no special studies using Missouri carriers who transport bulk commodities in dump trucks and made no review of any of the records of these companies. His testimony is based upon what he describes as his, "own personal philosophy concerning dump truck regulation." Professor Davis distinguished the dump truck industry from that of the traditional public utility. While the dump truck industry provides an essential service as a characteristic of a public utility, this service is provided to a limited number of customers. Demand is elastic in contrast to the inelasticity of demand experienced by public utilities. Both concern a product which cannot be stored or deferred and both require a large capital investment but, unlike public utilities, the dump truck industry experiences rapid capital turnover. Furthermore, where a public utility involves economies of scale, the dump truck industry experiences variable costs.

Professor Davis testified that a rate structure containing a minimum rate makes little economic sense as it prevents carriers from being able to price down to short run variable costs, perpetuating the survival of inefficient operators. He also stated that the goal of preventing excessive pricing to customers would be served as an adequate supply of carriers would be assured through the profit function of a variable cost industry attracting new people to that industry. Professor Davis did admit that predatory price cutting by some

carriers could result in those carriers operating unsafe equipment. He doesn't believe, however, that this would be the result as the maximum rate controls would alleviate the potential gain for those competing by using ruinous pricing strategies.

The theme of predatory pricing can be heard to reverberate throughout the lengthy testimony in the instant case. Not surprisingly, witnesses for DOT and for the intervenors echo another refrain much more ominous in tone. The testimony of George Fox is particularly illuminating. Fox was with the PSC in the transportation division for thirty-three years. He appeared on behalf of the intervenors. He testified that deregulating dump truck rates would have an adverse effect on the public safety.

Fox testified that the elimination of minimum rates could lead to a price war and, as a consequence of competition, carriers wanting to stay in business would be forced to match the reduced rates offered by their competitors.[4] He also expressed his concern over the fact that Tariff 2100 did not publish the rates to be charged in accordance with tariff filing requirements. Indeed, § 387.040, RSMo 1986, and § 387.050, RSMo 1986, both contain provisions to this effect. Appellants' tariff filing contained only the maximum rate that may be charged and not the actual charges for transporting bulk commodities in dump trucks.

Rennolds Potterfield appeared on behalf of the Missouri Dump Truckers Association. He raised many of the same concerns expressed by witness Fox over the effect that eliminating the minimum rate will have on safety and on the smaller operators. Other testimony, not detailed here because of its repetitive nature, was presented supporting these concerns. There certainly existed substantial and competent evidence on the subject for DOT to decide against the tariff. The division's order and report is neither arbitrary nor capricious. DOT cannot be faulted for

---

4. Obviously, in order to match the competition, these carriers would cut costs as much as possible and this course of action could lead to a reduction in the maintenance of equipment in an unsafe condition.

adopting the reasoning expressed by those testifying against Tariff 2100. It is well settled that the agency as the trier of fact, was free to choose between conflicting testimony. *State ex rel. Associated Natural Gas Company v. Public Service Commission, supra,* 706 S.W.2d at 882.

Affirmed.

All concur.